**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOSEPH RUDOLPH WOOD, III, *Plaintiff-Appellant*, <br><br> v. <br><br> CHARLES L. RYAN, Director of the Arizona Department of Corrections; RON CREDIO, Warden, ASPC-Eyman; LANCE R. HETMER, Warden, ASPC-Florence; UNKNOWN PARTIES, named as: John Does - unknown ADC Personnel, in their official capacities as Employees, Contractors, and/or Agents of the Arizona Department of Corrections, *Defendants-Appellees*. | No. 14-16310 <br><br> D.C. No. 2:14-cv-01447-NVW-JFM <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted
July 18, 2014—San Francisco, California

Filed July 19, 2014

Before: Sidney R. Thomas, Ronald M. Gould,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Thomas;
Dissent by Judge Bybee

## SUMMARY[*]

### Death Penalty

The panel reversed the district court's denial of a motion by Arizona state prisoner Joseph Rudolph Wood, III, who is scheduled to die by lethal injection on July 23, 2014, for a preliminary injunction delaying his execution until he receives information he seeks from the Arizona Department of Corrections regarding the method of his execution.

In a 42 U.S.C. § 1983 action filed by Wood and five other capital prisoners, the Wood argued that, by withholding the information, the Department has violated his First Amendment rights.

The panel did not reach the ultimate merits of the case, but held that Wood has raised serious questions as to the positive role that access to lethal-injection drug information and executioner qualifications will have in the public debate on methods of execution. Given the evidence presented by Wood regarding the historical right of access, the panel concluded that Wood has raised serious questions as to

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

whether a First Amendment right, in the context of public executions, attaches to the specific information he requests.

Because Wood has raised serious questions going to the merits of his First Amendment claim, the panel concluded that he has also established irreparable injury. Given the small impact the injunction will have on the state, the importance of First Amendment rights generally, and the critical importance of providing the public with the information it needs to debate the most severe form of punishment that exists, the panel concluded that the balance of equities tips sharply in Wood's favor. The panel also concluded that the injunction is in the public interest.

Dissenting, Judge Bybee wrote that the majority's newfound right of access is a dramatic extension of anything that this court or the Supreme Court has previously recognized, and it is in direct conflict with a very recent decision of the Eleventh Circuit. Judge Bybee wrote that the remedy is equally novel. He wrote that even if there were a First Amendment right of access, Wood would have no more right to the information than any other member of the public, and that it is unthinkable that if anyone else had brought this suit this court would stop a lawful execution until the State yielded the information.

---

**COUNSEL**

Jon M. Sands, Federal Public Defender, Dale A. Baich & Robin C. Konrad (argued), Assistant Federal Public Defenders, District of Arizona, Phoenix, Arizona, on behalf of Plaintiff-Appellant.

Thomas C. Horne, Attorney General, Jeffrey A. Zick, Chief Counsel, John Pressley Todd, Special Assistant Attorney General, Jeffrey L. Sparks (argued) & Matthew Binford, Assistant Attorneys General, State of Arizona, Phoenix, Arizona, for Defendants-Appellees.

**OPINION**

THOMAS, Circuit Judge:

Joseph Wood ("Wood") is scheduled to die by lethal injection on July 23, 2014. Wood seeks information from the Arizona Department of Corrections ("Department") regarding the method of his execution, which the Department has not provided. Wood argues that, by withholding this information, the Department has violated his First Amendment rights. He seeks a preliminary injunction delaying his execution until he receives the information. The district court denied Wood's motion. Although we do not reach the ultimate merits of the case, we conclude that Wood has presented serious questions going to the merits of his claim, and that the balance of hardships tips sharply in his favor. We therefore reverse the district court's denial of the motion for a preliminary injunction.

I

A

Wood was convicted and sentenced to death for the 1989 murders of his estranged girlfriend, Debra Dietz, and her father, Eugene Dietz. His conviction and sentence were affirmed on direct appeal by the Arizona Supreme Court.

*State v. Wood*, 881 P.2d 1158, 1177 (Ariz. 1994). The United States Supreme Court denied Wood's Petition for a Writ of Certiorari. *Wood v. Arizona*, 515 U.S. 1147 (1995). In 1996, Wood filed a state petition for post-conviction review. The state post-conviction court and the Arizona Supreme Court denied relief. In 2002, Wood filed a second post-conviction relief petition. The state post-conviction court and Arizona Supreme Court again denied relief. The federal district court denied his petition for a writ of habeas corpus. We affirmed the denial of his habeas petition. *Wood v. Ryan*, 693 F.3d 1104, 1122 (9th Cir. 2012).

On April 22, 2014, the Arizona Attorney General filed a motion seeking a Warrant of Execution. The Arizona Supreme Court granted the motion on May 28, 2014, setting Wood's execution date for July 23, 2014.

On April 22, the same day the State filed a motion seeking a warrant of execution, its Attorney General's office sent Wood's attorney, Julie Hall, a letter informing her that if the warrant was granted, the Department would use two drugs—Midazolam and Hydromorphone—to execute Wood. The State also indicated that if the Department could procure the drug Pentobarbital, it would "provide notice of its intent to use that drug."

On April 30, the head of Arizona's Federal Public Defender's Capital Habeas Unit, Dale Baich, sent the Department the first of four letters inquiring about the method the Department would use to execute Wood. He asked first about the two-drug protocol, inquiring about how the Department chose the amounts to be used of both drugs, the name and manufacturer of both drugs, the source of the drugs, and the credentials of those who would administer them. He

requested similar information concerning the Pentobarbital protocol and also asked how long the Department would plan to look for that drug.

The Department responded on May 6, indicating that it would use the new two-drug protocol on Wood if the warrant were granted, and that it had chosen the amounts of both drugs based on declarations and sworn testimony in "the Ohio Execution Protocol litigation." It also indicated that the drugs would be domestically obtained and FDA-approved, although it would not release other identifying information, citing Arizona's confidentiality law, Ariz. Rev. Stat. § 13-757. It noted that the qualifications of the IV team had not changed since the Department updated its protocol in 2012 to "include assurances of the" team's qualifications. Finally, the Department added that it will "continue to look for a source of pentobarbital indefinitely."

Baich responded on May 9. He again requested the drug manufacturer information, along with lot numbers and expiration dates for the two drugs. He also asked for copies of the actual documents in the Ohio litigation upon which the Department relied in devising its new protocol. Baich asked for clarification of the Department's claims that it would use the new two-drug protocol, but also continue to search for Pentobarbital. Finally, given the recent problematic execution in Oklahoma and past criticism of the Department by the district court in Arizona, Baich asked for the qualifications of the medical professionals who would perform the execution.

Baich followed up on May 15, forecasting the current litigation and directing the Department to preserve all electronically stored information and other documentation

that pertains to the questions Baich had asked.  He sent a second letter on that date, reiterating the questions from his previous letters and asking for documents from the Department in a variety of areas pertaining to his questions.

The Department responded on June 6, providing certain redacted records in response to Baich's request.  These records include redacted purchase orders, invoices, and order confirmations for Midazolam and Hydromorphone. Although information about the manufacturers and suppliers was redacted, the documents do display the expiration dates of the Midazolam and Hydromorphone: September and October 2015.  The Department refused to answer Wood's remaining requests and also referred him again to the State's execution protocol and the Ohio Execution Protocol litigation.  In a June 25, 2014 letter, the Department provided final confirmation that Wood would be executed using the two-drug protocol, consisting of Midazolam and Hydromorphone. Following this correspondence, Wood still seeks: (1) the source(s), manufacturer(s), National Drug Codes ("NDCs"), and lot numbers of the drugs the Department intends to use in his execution; (2) non-personally identifying information detailing the qualifications of the personnel the Department will use in his execution; and (3) information and documents explaining how the Department developed its current lethal-injection drug protocol.

B

On June 26, 2014, Wood and five other capital prisoners ("Wood" or "Plaintiffs") filed a 42 U.S.C. § 1983 complaint in the District of Arizona, seeking equitable, injunctive, and declaratory relief.  In the complaint, the Plaintiffs argue the

Department has not provided sufficient information in response to requests by the Federal Defender and alleges three counts: that by deliberately concealing lethal injection information, the Department has violated Plaintiffs' (1) First Amendment right to petition the government for redress of grievances and (2) First Amendment right to be informed about the manner in which Arizona implements the death penalty; and (3) that Arizona's protocol, developed without complying with the Food, Drug and Cosmetics Act, violates the Supremacy Clause of Article VI of the Constitution.

On July 2, Wood filed a motion for a preliminary injunction or temporary restraining order. Wood argued the district court should grant an injunction preventing the Department from carrying out his execution until it provides him with the information he requests. In a July 10 order, the district court denied Wood's preliminary injunction motion. The court concluded that the motion—founded on Wood's second First Amendment claim—was unlikely to succeed on the merits and that Wood had failed to present "serious questions" going to the claim's merits. *See Developmental Servs. Network v. Douglas*, 666 F.3d 540, 544 (9th Cir. 2011) ("Nevertheless, if a plaintiff fails to show that he has some chance on the merits, that ends the matter."). Wood filed a timely notice of appeal on July 10. We have jurisdiction under 28 U.S.C. § 1292(a)(1).

## II

## A

Wood appeals the district court's denial of his preliminary injunction motion. We review the "denial of a preliminary

injunction for abuse of discretion." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

To obtain a preliminary injunction on his First Amendment claim, Wood "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). We also recognize a variation on the *Winter* test—the "serious questions" version—which requires the plaintiff to demonstrate that "'serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor.'" *Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012) (quoting *Alliance for the Wild Rockies*, 632 F.3d at 1135). The plaintiff must still establish the other *Winter* factors as well. *Id.* "This approach requires that the elements of the preliminary injunction test be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.* The "serious questions" version does not require a "separate and independent analysis from the court's assessment of [Wood's] likelihood of success on the merits." *Lopez v. Brewer*, 680 F.3d 1068, 1073 (9th Cir. 2012). There are special considerations in a capital case when a plaintiff requests a stay of execution. "'[F]iling an action that can proceed under § 1983 does not entitle the complainant to an order staying an execution as a matter of course.'" *Towery*, 672 F.3d at 657 (quoting *Hill v. McDonough*, 547 U.S. 573, 583–84 (2006)). "Rather, 'a stay of execution is an equitable remedy' and 'equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts.'" *Id.* (quoting *Hill*, 547 U.S. at 584).

B

The district court concluded that Wood was unlikely "to show that he has some chance on the merits" of his First Amendment claim, and therefore denied the motion. *Developmental Servs. Network*, 666 F.3d at 544. In the claim at issue, Wood argues that the Department is violating his "First Amendment right of access to execution-related governmental information." To prevail at the preliminary injunction stage, Wood[1] must raise serious questions going to the merits of his First Amendment claim: (1) that this case is actually the type of case to which our right of access analysis properly applies; and (2) that the First Amendment right of access attaches to the execution-related governmental information he seeks. *Cal. First Amendment Coal. v. Woodford*, 299 F.3d 868, 873–77 (9th Cir. 2002). We address each question in turn.

1

The Supreme Court has recognized "that the First Amendment guarantees the public—and the press—a qualified right of access to governmental proceedings." *Cal. First Amendment Coal.*, 299 F.3d at 873. Underlying this

---

[1] Wood and his co-plaintiffs sue to enforce a public First Amendment right. They may sue to enforce that right as individual citizens. *Cf. Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982) (stating that the First Amendment protections in cases involving the right of access to governmental proceedings ensures "that *the individual citizen* can effectively participate in and contribute to our republican system of self-government" (emphasis added)); *see also Pell v. Procunier*, 417 U.S. 817, 822 (1974) ("[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.").

right "is the common understanding that 'a major purpose of that Amendment was to protect the free discussion of governmental affairs.'" *Globe Newspaper Co.*, 457 U.S. at 604 (1982) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)). This protection ensures "that the individual citizen can effectively participate in and contribute to our republican system of self-government." *Id.* The Supreme Court has recognized a qualified right of access to criminal trials, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579–80 (1980), the testimony of child victims of sex offenses, *Globe Newspaper Co.*, 457 U.S. at 603–11, voir dire, *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 505–11 (1984), and preliminary hearings, *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 10–13 (1986) ("*Press-Enterprise II*").

Applying the two-factor analysis described in *Press-Enterprise II*, we recognized in *California First Amendment Coalition* "that the public enjoys a First Amendment right to view executions from the moment the condemned is escorted into the execution chamber, including those 'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death." 299 F.3d at 877. In acknowledging this right, we noted that "[t]o determine whether lethal injection executions are fairly and humanely administered, or whether they ever can be, citizens must have reliable *information* about the 'initial procedures,' which are invasive, possibly painful and may give rise to serious complications." *Id.* at 876 (emphasis added).

Since *Richmond Newspapers, Inc.*, we have recognized not just a right of access to certain court proceedings, but also to documents related to those proceedings in which we found a right of access. *Oregonian Publ'g Co. v. United States*

*Dist. Court*, 920 F.2d 1462, 1465 (9th Cir. 1990) ("Under the first amendment, the press and the public have a presumed right of access to court proceedings and documents.").

For example, in *Oregonian Publishing Co.*, we recognized a qualified right of access not just to "plea agreements," but to "related documents." *Id.* at 1465–66. The "related documents" in that case included the memorandum by the defendant supporting his motion to seal the plea agreement and the district court's findings in support of its order to seal. *Id.* at 1463–64. In *Seattle Times Co. v. United States Dist. Court*, 845 F.2d 1513, 1514–17 (9th Cir. 1988), we also recognized a qualified right of access to pretrial release proceedings and related documents, including financial affidavits filed in support of a motion for court-appointed counsel and briefs filed regarding preliminary detention. Similarly, in *CBS, Inc. v. United States Dist. Court*, 765 F.2d 823, 824–26 (9th Cir. 1985), we acknowledged a qualified right of access to post-trial documents, including a motion to reduce a criminal sentence and the prosecution's response. *See also id.* at 825 (stating the "presumption that the public and the press have a right of access to criminal proceedings and documents filed therein"). In *Phoenix Newspapers, Inc. v. United States Dist. Court*, 156 F.3d 940, 946–49 (9th Cir. 1998), we recognized a qualified right of access to transcripts of closed post-trial proceedings. Finally, we recently acknowledged the First Amendment right of access "to civil proceedings and associated records and documents." *Courthouse News Serv. v. Planet*, 750 F.3d 776, 786 (9th Cir. 2014).

In short, the right to access to documents intrinsically associated with public proceedings forms an important component of the *Press-Enterprise II* First Amendment right

of access. To be sure, the First Amendment does not generally grant "a right of access to government information or sources of information within the government's control," *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978). Relying on this general principle, Arizona argues that the information Wood seeks cannot be subjected to the *Press-Enterprise II* right of access analysis. But this straw man argument begs the question. The issue is not whether *Press-Enterprise II* grants a generalized right of access to executive branch documents. It does not. Rather, the question is whether, consistent with our precedents, the documents sought in this case are so intrinsically intertwined with a recognized right that disclosure is required.

In *California Free Amendment Coalition*, we recognized a right to view the entire execution, including those initial procedures "inextricably intertwined" with the process of putting an inmate to death. 299 F.3d at 877. And in that case, we explicitly stated the focus and scope of that right: providing citizens with "reliable information" about the execution's initial procedures, "which are invasive, possibly painful and may give rise to serious complications." 299 F.3d at 876. Here, like the memoranda, factual findings, affidavits, and transcripts recognized in other cases, Wood seeks access to documents—information regarding the drugs that will be used to execute him, the qualifications of the execution team, and the documents and evidence the State relied on in adopting its new execution protocol—that are related to, and arguably necessary for a full understanding of, a proceeding in which we have already granted a qualified right of access. This information is "inextricably intertwined" with the process of putting Wood to death. As a result, the *Press-*

*Enterprise II* analysis applies as to the information Wood seeks.**[2]**

2

Under the *Press-Enterprise II* First Amendment test, two "'complementary considerations'" inform the analysis: "(1) 'whether the place and process have historically been open to the press and general public[ ]' and (2) 'whether public access plays a significant positive role in the functioning of the particular process in question.'" *Cal. First Amendment Coal.*, 299 F.3d at 875 (quoting *Press-Enterprise II*, 478 U.S. at 8–9) (alteration in original).

---

**[2]** The dissent argues that our First Amendment right of access analysis only applies to formally filed documents "that transcribe or memorialize official proceedings." But the proceeding at issue, an execution, is different than all of the other proceedings in which we have recognized a qualified right of access. Executions do not involve the same type of formal dockets or filed documents as criminal trials, or pretrial and post-trial proceedings. Moreover, our holding in *California First Amendment Coalition* recognized a right of access to executions and clarified that the right seeks to give citizens "reliable information" about the initial procedures involved in an execution, including the process of administering lethal drugs. 299 F.3d at 876. The information Wood seeks is closely tied to the underlying proceeding. And the informed citizenry we described is critical to the successful functioning of the death penalty, unlike in a case like *Jury Service Resource Center v. Muniz*. When the nonprofit organization in that case sought access to jury pool records, the court explicitly acknowledged that the jury pool selection process is removed from the public trial and that "public access plays no significant role in the . . . function of collecting and winnowing names for jury lists." 134 P.3d 948, 954 (Or. 2006). Given the unique nature of an execution, and keeping in mind the boundaries of our holding and reasoning in *California First Amendment Coalition*, we apply *Press-Enterprise II* to the information Wood seeks without announcing the expansive new rule the dissent describes.

i

Wood has at least raised serious questions about the historical openness surrounding the information he seeks. Because Wood seeks materials inextricably intertwined with the execution, our analysis focuses in part on the historic openness of the execution itself. *See, e.g.*, *Oregonian Publ'g Co.*, 920 F.2d at 1465–66 (recognizing a right of access to plea agreements and "related documents" by assessing the historical tradition of access to plea agreements alone); *Seattle Times Co.*, 845 F.2d at 1516–17 (recognizing a right of access to pretrial detention proceedings "and documents filed therein" by analyzing the limited history of formal and informal pretrial proceedings). As we noted in *California First Amendment Coalition*, executions in both England and the United States have historically been "open to all comers." 299 F.3d at 875. Public executions were historically "a fixture of American society," taking place in the middle of the day in "the public square." John D. Bessler, Death in the Dark: Midnight Executions in America 23 (1997). Even when executions were moved from the public square into prisons, "states implemented procedures that ensured executions would remain open to some public scrutiny." *Cal. First Amendment Coal.*, 299 F.3d at 875. As we noted in *California First Amendment Coalition*, "[e]very state authorizing the death penalty currently requires that official witnesses be present at each execution." *Id.* at 875. Indeed, Arizona law explicitly requires the presence of "at least twelve reputable citizens." Ariz. Rev. Stat. § 13-758. In sum, the broad tradition of a public right of access to executions is indisputable.

Similarly, as Wood has demonstrated, important details about early methods of executions were also public. For

example, public accounts in some states supplied information about both the types of ropes used in hangings and the manufacturers who provided them.[3]  Public outcry over a reportedly botched hanging in Arizona led to debate over methods of execution and the eventual adoption in that state of the gas chamber.  *See* Scott Christianson, *The Last Gasp: The Rise and Fall of the American Gas Chamber* 100–01 (2010).  Similarly, the company that produced the cyanide used in Nevada's gas chambers, California Cyanide Company, publicly contracted with the state, and the identities of many of the officials who handled the chemical up until the point of execution were a matter of public record. *See id.* at 76–79.  Newspapers reported openly on gas chambers, describing their size, cost, and makeup, and explained that Eaton Metal Products Co., which delivered gas chambers to states like Arizona, had a "patent on the death machine."[4]  Furthermore, although the method was not used in Arizona, public debate over the adoption of the electric chair in some states revolved in part around the specific details of the type of electricity and equipment used in the

---

[3] *See, e.g.*, Chris Woodyard, *Enough Rope: The Hangman's Rope in the Press*, Haunted Ohio (Jan. 19, 2013), http://hauntedohiobooks.com/news/ enough-rope-the-hangmans-rope-in-the-press/ (summarizing news reports describing the types of ropes used in executions and the suppliers who produced them); *see also, e.g.*, *John Brown, Hanged with Kentucky Rope*, University of Kentucky Libraries, http://nkaa.uky.edu/ record.php?note_id=1625 (last visited Jul. 18, 2014) (explaining that different ropes were submitted for use in the hanging of John Brown, were displayed to the public before the execution, and the strongest and most durable was selected).

[4] *Eight States Now Are Using Gas Chambers for Executions*, Sarasota Herald Tribune, Jan. 2, 1955, at 17, *available at* http://news.google.com/ newspapers?nid=1755&dat=19550102&id=t-QhAAAAIBAJ&sjid=82 QEAAAAIBAJ&pg=2642,267124.

executions. *See* Stuart Banner, *The Death Penalty: An American History* 178–85 (2002). Finally, in some states, like Florida, state law dictated that the sheriff would serve as "deputy executioner" of the execution, providing a sense not just of the identity but, just as importantly, the qualifications of the person overseeing the execution. *See* Ken Driggs, *A Current of Electricity Sufficient in Intensity to Cause Immediate Death: A Pre-*Furman *History of Florida's Electric Chair*, 22 Stetson L. Rev. 1169, 1179–84 & n.52 (1993).

Wood also points to evidence that states have made details about their lethal injection drug protocols available to the public. Indeed, following litigation, the State of Arizona released the manufacturer of the drug Pentobarbital, the drug's National Drug Code, the drug's lot number, and its expiration date. Notice of Disclosure, *Schad v. Brewer*, No. 2:13-cv-13-02001-ROS (D. Ariz. Oct. 5, 2013), ECF No. 24. In response to a public records request, the state of Arkansas in 2013 released information about its lethal injection drugs, including the pharmaceutical manufacturer and batch numbers. And in Texas, the Attorney General only recently changed course and started keeping secret the source of its lethal injection drugs.[5] Similarly, Louisiana has only recently attempted to shield the identities of suppliers of lethal injection drugs.[6]

---

[5] Greg Abbott, *Keep Execution Drug Supplier Secret*, Austin American-Statesman, May 29, 2014, http://www.mystatesman.com/news/news/greg-abbott-keep-execution-drug-supplier-secret/nf9bQ/?icmp=statesman_internallink_textlink.

[6] Julia O'Donoghue, *Make Louisiana Execution Drug Suppliers Secret, State Prison Boss Asks Legislature*, New Orleans Times-Picayune,

This evidence does not conclusively establish a historical tradition of public access to the sources of lethal injection methods or the qualifications of executioners.  Nor does it show with certainty that all states have acted alike in terms of making execution-related information public, or that states have always been the primary guarantor of transparency.  But such exhaustiveness is not required at the preliminary injunction stage.  Instead, we ask only whether Wood raises "serious questions" going to the merits.  *Towery*, 672 F.3d at 657.

Moreover, the first factor in the *Press-Enterprise II* test is not necessarily dispositive.  *See Seattle Times Co.*, 845 F.2d at 1516 (noting that the "history and [] prevalent use of informal procedures" in pretrial detention proceedings, in lieu of an "unbroken history of public access," "should not automatically foreclose a right of access"); *see also Phoenix Newspapers*, 156 F.3d at 948 (noting that as to post-trial transcript access, even if the history factor was "not dispositive," the second factor would be).  Here, Wood has provided evidence that executions in general have long been open to the public, and that information regarding the methods of execution and the qualifications of the executioners have been open as well.  This evidence, at a minimum, raises "serious questions" as to the historical right of access to the information Wood seeks.

ii

In recognizing a qualified right of access to viewing the entirety of executions, we noted that "[i]ndependent public

May 14, 2014, http://www.nola.com/politics/index.ssf/2014/05/ louisiana_execution_drugs.html.

scrutiny . . . plays a significant role in the proper functioning of capital punishment." *Cal. First Amendment Coal.*, 299 F.3d at 876. The Supreme Court has stated that no rigid standard for appropriate methods of execution exists and that, in the Eighth Amendment context, the Court must determine what type of execution constitutes cruel and unusual punishment "from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). As a result, "[a]n informed public debate is critical in determining" whether a specific execution method comports with this country's "evolving standards of decency." *Cal. First Amendment Coal.*, 299 F.3d at 876. Indeed, we have specifically held that "[t]o determine whether lethal injection executions are fairly and humanely administered, or whether they can ever be, citizens must have reliable *information* about the 'initial procedures,' which are invasive, possibly painful, and may give rise to serious complications." *Id.* (emphasis added). Providing access to executions also creates a sense of fairness that commands more respect for the judicial process from the public. *Id.*

That same reasoning compels us to conclude that Wood has raised serious questions as to the positive role public access to the information he seeks would play in executions. There has been a seismic shift in the lethal injection world in the last five years, as states have struggled to obtain the drug traditionally used in executions, thiopental.[7] In response, states "began using [the drug] pentobarbital as a substitute," but its primary manufacturer, the pharmaceutical company Lundbeck, stopped selling the drug to prisons because it

---

[7] Erik Eckholm & Katie Zezima, *States Face Shortage of Key Lethal Injection Drug*, N.Y. Times, Jan. 21, 2011, http://www.nytimes.com/2011/01/22/us/22lethal.html.

opposes the death penalty.[8] States are now seeking new types and combinations of drugs, like Midazolam and Hydromorphone, and states are enacting laws to shield the identities not just of executioners, but of the companies that produce lethal injection drugs.[9] *See, e.g.*, Ga. Code Ann. § 42-5-36. But several flawed executions this year, including two in Oklahoma, and one in Ohio featuring the same two drugs at issue here, have sparked public curiosity and debate over the types—and quality—of drugs that should be used in lethal injections.[10]

Given the law in *California First Amendment Coalition*, and the factual backdrop of the past six months in particular, more information about the drugs used in lethal injections can help an alert public make better informed decisions about the changing standards of decency in this country surrounding

---

[8] David Jolly, *Danish Company Blocks Sale of Drug for U.S. Executions*, N.Y. Times, Jul. 1, 2011, http://www.nytimes.com/2011/07/02/world/europe/02execute.html.

[9] Pete Williams, *Will Courts Lift Veil of Secrecy Around Lethal Injections*, NBC News, Feb. 27, 2014, http://www.nbcnews.com/storyline/lethal-injection/will-courts-lift-veil-secrecy-around-lethal-injections-n40171.

[10] *Id.*; Max Ehrenfreund, *Dennis McGuire Executed in Ohio with New Combination of Lethal Drugs*, Wash. Post, Jan. 16, 2014, http://www.washingtonpost.com/national/dennis-mcguire-executed-in-ohio-with-new-combination-of-lethal-drugs/2014/01/16/612e22a2-7ede-11e3-93c1-0e888170b723_story.html; *see also* Editorial, *Secrecy Behind Executions*, N.Y. Times, Jan. 29, 2014, http://www.nytimes.com/2014/01/30/opinion/secrecy-behind-executions.html; Megan McCracken & Jennifer Moreno, Op-Ed, *Secret Drugs, Agonizing Deaths*, N.Y. Times, Apr. 13, 2014, http://www.nytimes.com/2014/04/14/opinion/secret-drugs-agonizing-deaths.html?smid=fb-share&_r=2.

lethal injection. Knowing the source and manufacturer of the drugs, along with the lot numbers and NDCs, allows the public to discern whether state corrections departments are using safe and reliable drug manufacturers. Similarly, knowing the specific qualifications of those who will perform the execution will give the public more confidence than a state's generic assurance that executions will be administered safely and pursuant to certain qualifications and standards.

Arizona argues that the information Wood seeks offers little value to the public debate and that releasing this information will serve instead to deter drug manufacturers from providing lethal injection drugs and lead to public disclosure of the identities of those who will administer the drugs. We recognize that the State has a strong interest in carrying out its criminal judgments. *Towery*, 672 F.3d at 657. But the State's argument ignores the ongoing and intensifying debate over lethal injection in this country, and the importance of providing specific and detailed information about how safely and reliably the death penalty is administered. Moreover, the State can point to no evidence in the record to support its claim that pharmaceutical companies will stop providing drugs if this information is released or that no alternatives are available even if some companies do change course. There is nothing in the record, save speculation, that manufacturers will not provide the product. Indeed, Arizona has continued to effectively administer the death penalty using domestically produced lethal injection chemicals since it released drug information in *Schad v. Brewer*. Similarly, the State fails to point to evidence to support its claim that releasing the qualifications of those administering the execution will lead to them being identified publicly.

In sum, Wood has raised serious questions on the merits as to the positive role that access to lethal-injection drug information and executioner qualifications will have in the public debate on methods of execution. And given the evidence presented by Wood regarding the historical right of access, we conclude that Wood has raised serious questions as to whether a First Amendment right, in the context of a public executions, attaches to the specific information he requests.

C

We proceed to consider the remaining three *Winter* factors. First, Wood will face irreparable harm if the injunction is not granted. We have previously stated that "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (alteration in original); *see also Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 828 (9th Cir. 2013) (same); *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 748 (9th Cir. 2012) (same). Here, as to Wood's specific claims, they likely will become moot after his execution.

Similarly, we have also stated that "a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (internal quotation marks omitted). Because Wood has raised serious questions going to the merits of his First Amendment claim, we conclude he has also established irreparable injury.

D

Because we conclude only that Wood has raised "serious questions" going to the merits of his claim, he must also show that the balance of equities tips *sharply* in his favor. *Towery*, 672 F.3d at 657. We acknowledge that Arizona does have a "strong interest in enforcing its judgments without undue interference from federal courts." *Id.* at 661 (internal quotation marks omitted). The state's interest is especially strong in a case like this one, in which legal proceedings have continued for more than twenty years beyond the crime. *Bible v. Schriro*, 651 F.3d 1060, 1066 (9th Cir. 2011) ("[T]he further delay from a stay [of execution] would cause hardship and prejudice to the State and victims, given that the appellate process in this case has already spanned more than two decades.").

Nevertheless, we conclude the balance of equities here tips sharply in Wood's favor. Wood is seeking to enforce a public, First Amendment right. He wants a stay of his execution only until he receives the information he seeks. Thus, it is unlikely that granting the injunction would unnecessarily delay the state's ability to enforce its judgments. Moreover, as we discussed above, the State has failed to provide any record evidence of the damage it believes will occur if it is forced to reveal this information. Given the small impact the injunction will have on the state, the importance of First Amendment rights generally, and the critical importance of providing the public with the information it needs to debate the most severe form of punishment that exists, we conclude that the balance of equities tips sharply in Wood's favor.

E

Finally, since Wood's execution would likely not be delayed much, if at all, by giving him the information he seeks, the public interest factor weighs in Wood's favor. "Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press*, 682 F.3d at 826 (internal quotation marks omitted). Indeed, as we discussed above, this information will play an important role in the ongoing and intensifying public debate over capital punishment and lethal injection methods specifically.

Arizona's recent history reinforces the role of this information in the public discourse. In the case of Donald Beaty, the State announced eighteen hours before the execution that it intended to switch to the use of a drug that it had never tested and in the use of which it had never trained its executioners. *Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011) (Reinhardt, J., dissenting from the denial of rehearing en banc). In the cases of Robert Towery and Robert Moormann, the state changed its written execution protocol at the last minute, then changed course yet again, informing the court just hours before argument that it was switching the method of execution "because it discovered at the last minute that the originally-planned drugs had expired" a month before. *Towery*, 672 F.3d at 652–53. Here, the State has announced that it will use an untested protocol, and that it reserves the right to use Pentobarbital if it becomes available. The recent history in Arizona does not provide a reliable source of data as to its current method of execution, underscoring the need for transparency.

Information concerning execution protocol is not only of general interest to the public, it is important for consideration by the courts. For example, data concerning gas chamber executions informed our decision to ban such executions. *Fierro v. Gomez*, 77 F.3d 301, 306–09 (9th Cir. 1996), *judgment vacated*, 519 U.S. 918 (1996). It also informed our decision to sustain hanging as a method of execution in *Campbell v. Wood*, 18 F.3d 662, 681–87 (9th Cir. 1994). We, and the public, cannot meaningfully evaluate execution protocol cloaked in secrecy. It is in the public's interest that Wood's injunction be granted.

## III

Because we conclude that Wood has raised serious questions as to the merits of his First Amendment claim; that the balance of equities tips sharply in his favor; that he will face irreparable harm if the injunction is not granted; and that the injunction is in the public interest; we conclude that the district court abused its discretion in denying Wood's preliminary injunction request. We do not decide with certainty that a First Amendment right exists to the information Wood seeks, nor do we resolve the merits of the Plaintiffs' underlying § 1983 claim. We do, however, reverse the district court's denial of Wood's preliminary injunction motion. We grant a conditional preliminary injunction, staying Wood's execution until the State of Arizona has provided him with (a) the name and provenance of the drugs to be used in the execution and (b) the qualifications of the medical personnel, subject to the restriction that the information provided will not give the means by which the

specific individuals can be identified. Once he has received that information, the injunction shall be discharged without more and the execution may proceed.

**REVERSED.**

---

BYBEE, Circuit Judge, dissenting:

Arizona intends to execute Joseph R. Wood III on July 23, 2014. On the eve of his execution, Wood asserts a generalized First Amendment right of public access to information in the government's possession regarding the State's supplier of lethal drugs, its execution personnel, and the manner in which the State developed its lethal-injection protocol. Wood asks this court to stay his execution pending the resolution of his request for information. The majority not only finds that Wood's novel First Amendment argument will likely prevail, but also that he is entitled to a stay of his execution until the State complies. Both are unprecedented.

The majority's newfound right of access is a dramatic extension of anything that we or the Supreme Court have previously recognized, and it is in direct conflict with a very recent decision of the Eleventh Circuit, *Wellons v. Comm'r, Ga. Dep't of Corr.*, No. 14-12663-P, 2014 WL 2748316, — F.3d — (11th Cir. June 17, 2014), and a recent decision of the Georgia Supreme Court, *Owens v. Hill*, 758 S.E.2d 794 (Ga. 2014). The remedy is equally novel. Even if there were a First Amendment right of access, Wood would have no more right to the information than any other member of the public. It is unthinkable that if anyone else had brought this suit we would

stop a lawful execution until the State yielded the information.

The majority has charted a new course, one I cannot follow. I respectfully dissent.

I

Wood shot and killed his estranged girlfriend, Debra Dietz, and her father, Eugene Dietz, on August 7, 1989, at a Tucson automotive paint and body shop owned and operated by the Dietz family. A jury convicted Wood of two counts of first-degree murder and two counts of aggravated assault. He was then sentenced to death. *See Wood v. Ryan*, 693 F.3d 1104 (9th Cir. 2012).

On March 26, 2014, the Arizona Attorney General announced that the Arizona Department of Corrections (ADC) had changed its lethal-injection protocol to allow for the use of a two-drug protocol using midazolam and hydromorphone in carrying out executions.[1] The Attorney General explained that the State could no longer reliably obtain pentobarbital to perform lethal injections because when the identities of pentobarbital manufacturers were disclosed publicly, some manufacturers received threats and became unwilling to supply pentobarbitral to state

---

[1] The current execution protocol, found in Department Order 710, calls for the use of 50 mg of midazolam and 50 mg of hydromorphone. It also provides for one-drug protocols using pentobarbital or sodium pentothal.

corrections' agencies. This created a public safety issue as ADC was compelled to seek alternative lethal drugs.[2]

On April 22, 2014, the State moved for a warrant of execution for Wood.[3] That same day, the State sent a letter to Wood's counsel informing her that ADC would use the two-drug protocol for the execution. The State also indicated that if ADC could obtain pentobarbital, ADC would provide notice of its intent to use that drug.

On April 30, 2014, Wood's counsel sent ADC a letter requesting (1) information regarding the provenance of ADC's midazolam and hydromorphone, (2) an explanation of ADC's continuing search for pentobarbital, (3) information regarding the Drug Enforcement Administration (DEA) qualifications of ADC personnel who would participate in Wood's execution, and (4) an explanation of how ADC developed its two-drug protocol.

On May 6, 2014, ADC replied, indicating that the drugs were "domestically obtained" and "FDA approved." ADC declined to provide further information about the drugs based on ADC's interpretation of Arizona's executioner-confidentiality statute, Ariz. Rev. Stat. § 13-757(C). ADC noted that it continued to look for pentobarbital and would inform Wood if it obtained the drug. ADC also declined to provide specific information about the DEA qualifications of

---

[2] *See* Press Release, Attorney Gen. of Ariz., State of Arizona Announces Change to Lethal Injection Protocol (March 26, 2014), https://www.azag.gov/press-release/state-arizona-announces-change-lethal-injection-protocol.

[3] A warrant of execution was issued on May 28, 2014.

the execution personnel, but stated that "the qualifications for the IV team as set forth in Department Order 710.02-1.2.5 have not changed since the ADC amended the protocol in September, 2012, to include assurances of the IV team's qualifications." Finally, ADC stated that the development of ADC's two-drug protocol was based on affidavits and testimony in Case No. 2:11-CV-1016, in the Southern District of Ohio.

On May 9, 2014, Wood's counsel responded, seeking clarification and requesting the specific Ohio documents referenced in ADC's letter. Counsel again requested the qualifications of the personnel who would participate in Wood's execution, as well as evidence demonstrating that ADC had verified those qualifications.

On May 15, 2014, Wood's counsel sent another letter, again asking for the DEA and medical qualifications of ADC personnel, along with information about the development of ADC's two-drug protocol. Counsel also requested documents regarding correspondence with various state and federal agencies.

On June 6, 2014, ADC sent Wood a response in which it provided copies of purchase orders, invoices, and order confirmations for the midazolam and hydromorphone. Although the documents reveal the drug names and expiration dates—September and October 2015—information about the manufacturers and suppliers of the drugs was redacted. ADC also stated that the Inspector General had verified the qualifications of ADC personnel, both before and after issuance of Wood's warrant of execution, and that in the event a central femoral line were used, it would be placed by a person currently licensed or certified to do so. ADC

declined to provide copies of the Ohio documents, asserting that because the Federal Public Defender's Office was involved in the Ohio litigation, Wood's counsel—the Federal Public Defender—would already have access to them.

On June 26, 2014, Wood filed a civil rights complaint alleging three claims: (1) a violation of the First Amendment right of access to the courts, (2) a violation of the First Amendment right of access to governmental proceedings, and (3) a Supremacy Clause violation based on ADC's alleged failure to follow the Food, Drug, and Cosmetics Act in adopting its lethal-injections protocol.

On June 28, 2014, Wood received final notice from ADC that it would use the two-drug protocol for his execution. Wood then filed a motion for a preliminary injunction on July 2, 2014, based only on his right of access to governmental proceedings claim. The district court denied that motion on July 10, 2014, reasoning that Wood could not show a likelihood of success on the merits because he has no First Amendment right of access to the specific information that he seeks. Wood filed a timely notice of appeal.

II

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the "serious questions" version of this test articulated by our court, "a preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the

merits were raised and the balance of the hardships tips strongly in the plaintiff's favor." *Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012). The "serious questions" version "requires that the elements of the preliminary injunction test be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id*.

In the context of a capital case, the Supreme Court has emphasized that these principles apply when a condemned prisoner asks a federal court to enjoin his impending execution because "[f]iling an action that can proceed under § 1983 does not entitle the complainant to an order staying an execution as a matter of course." *Hill v. McDonough*, 547 U.S. 573, 583–84 (2006). Rather, "a stay of execution is an equitable remedy" and "equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Id*. at 584. We review the denial of a preliminary injunction for abuse of discretion. *Towery*, 672 F.3d at 657.

## III

"Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control." *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978) (plurality opinion). Thus, "[a]s a general rule, citizens have no first amendment right of access to traditionally nonpublic government information." *McGehee v. Casey*, 718 F.2d 1137, 1147 (D.C. Cir. 1983). Open meetings laws, such as the Government in the Sunshine Act, 5 U.S.C. § 552b, and public records acts, such as the Freedom of Information Act, 5 U.S.C. § 552, provide persons with a broad, statutory right of access to government proceedings

and documents. But, in general, the right of access is statutory, not constitutional, in nature: "[The Supreme] Court has repeatedly made clear that there is no constitutional right to obtain all the information provided by FOIA laws." *McBurney v. Young*, 133 S. Ct. 1709, 1718 (2013).

The Supreme Court has recognized a qualified First Amendment right of access to some governmental proceedings, principally those related to the courts. *See Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 8–14 (1986) ("*Press-Enterprise II*"); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603–11 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579 (1980). "Underlying th[is] First Amendment right of access . . . is the common understanding that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Globe Newspaper*, 457 U.S. at 604 (internal quotation marks and citation omitted). The Court has applied the right of public access to proceedings in criminal trials, including preliminary hearings, *Press-Enterprise II*, 478 U.S. at 8–14, voir dire, *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 510–11 (1984) ("*Press-Enterprise I*"), the testimony of the child victim of a sex offense, *Globe Newspaper Co.*, 457 U.S. at 603–11, and criminal trials in general, *Richmond Newspapers, Inc.*, 448 U.S. at 580. We have explained that this qualified First Amendment right of access applies to "criminal proceedings and documents filed therein,"*CBS, Inc. v. U.S. Dist. Court*, 765 F.2d 823, 825 (9th Cir. 1985), and have said that it extends to pretrial release proceedings, *Seattle Times Co. v. U.S. Dist. Court*, 845 F.2d 1513, 1517 (9th Cir. 1988), and pretrial suppression hearings, *United States v. Brooklier*, 685 F.2d 1162, 1170–71 (9th Cir. 1982). We have limited the right of access to "documents filed therein" to documents that transcribe or memorialize official

proceedings: transcripts of closed hearings that occurred during jury deliberations, *Phoenix Newspapers, Inc. v. U.S. Dist. Court*, 156 F.3d 940, 949 (9th Cir. 1998), plea agreements and related documents, *Oregonian Publ'g Co. v. U.S. Dist. Court*, 920 F.2d 1462, 1465–66 (9th Cir. 1990), and pretrial release documents, *Seattle Times Co.*, 845 F.2d at 1517.

In *California First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir. 2002), we extended these cases to reach the conclusion that "the public enjoys a First Amendment right to view executions from the moment the condemned enters the execution chamber" to the time he is pronounced dead. *Id*. at 877. We arrived at this conclusion after addressing the considerations set forth in *Press-Enterprise II*: (1) "whether the place and process have historically been open to the press and general public," and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8–9. First, we found that there is a public right to view execution proceedings because "[h]istorically, executions were open to all comers." *Cal. First Amendment Coal.*, 299 F.3d at 875. We observed that even when California abolished public executions, it provided that official witnesses should be present at the execution, a practice followed by every state that authorizes the death penalty. *Id*. Second, we found that "[i]ndependent public scrutiny [of the execution proceeding] . . . plays a significant role in the proper functioning of capital punishment." *Id*. at 876. We explained that "public observation of executions fosters the same sense of catharsis that public observation of criminal trials fosters." *Id.* at 877. Notably, we said nothing about the public's right to gain access to any documents related to the execution.

In *California First Amendment Coalition*, we were careful to explain that this right of public access is a right belonging to the public, and not a right belonging to any individual. *See id*. at 873 ("It is well-settled that the First Amendment guarantees *the public* . . . a qualified right of access to governmental proceedings." (emphasis added)). Very recently, the Eleventh Circuit recognized this important distinction in a case where the plaintiff sought governmental information regarding lethal injection, as in the case before us today. *Wellons*, 2014 WL 2748316, at \*5–6 (affirming the district court's denial of a preliminary injunction in part because public access cases "turn on the public's, rather than the individual's, need to be informed so as to foster debate"). At oral argument and in his briefing, Wood makes clear that he is asserting a right of access enjoyed by the public at large, and not a right or privilege personal to him. Whatever the scope of the First Amendment right of access, Wood has no greater claim than any other member of the public.

IV

Wood seeks the following information: the source(s), manufacturer(s), National Drug Codes, and lot numbers of the drugs that ADC intends to use in his execution; information regarding the medical, professional, and controlled-substances qualifications of the personnel that ADC intends to use in his execution; and information and documents detailing the manner in which ADC developed its two-drug protocol. It is important to note that the State has already disclosed significant information, including the type of drugs, the dosages to be used, and their expiration dates, as well as the fact that the drugs are domestically obtained and FDA approved; the necessary qualifications for ADC personnel and the fact that the Inspector General verified the

qualifications of ADC personnel both before and after the issuance of Wood's warrant of execution; and the actual two-drug protocol itself.

The fundamental flaw in Wood's request for a preliminary injunction is that Wood does not actually assert a right of access to a governmental proceeding. The Supreme Court has long held that the First Amendment does not provide a general right to information in the government's possession. *See Houchins*, 438 U.S. at 15; *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 40 (1999) ("[W]hat we have before us is nothing more than a governmental denial of access to information in its possession. California could decide not to give out arrestee information at all without violating the First Amendment."); *McBurney*, 133 S. Ct. at 1718. And the Court has cautioned that "[t]he Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act." *Houchins*, 438 U.S. at 14. This default principle—that there is no general First Amendment right to information in the government's possession—ought to guide our analysis.

The qualified First Amendment right of access to governmental proceedings is properly viewed as a exception to the default principle, limited to governmental "proceedings and documents filed therein." *CBS, Inc.*, 765 F.2d at 825. This right does not extend to every piece of information that conceivably relates to a governmental proceeding, even if the governmental proceeding is itself open to the public. It is not a tool for judges to pry open the doors of state and federal agencies because they believe that public access to this type of information would be a good idea. It is a qualified right to certain "proceedings and documents filed therein" and nothing more. In effect, the right prevents the government

from restraining access to proceedings and filed documents that have historically been made available to the public. It is a First Amendment obligation by estoppel, not an untethered license to governmental information.

Wood contends that our precedent guarantees access to the information that he seeks. It does nothing of the kind. Unlike the plaintiffs in *California First Amendment Coalition*, Wood does not seek access to a criminal *proceeding*, nor does he seek documents filed in a proceeding or transcripts of the proceeding. Instead, he wants *information* in the government's possession; effectively, he has taken the general right of the public to view executions and turned it into a FOIA request for documents related to the execution. *California First Amendment Coalition* says nothing about information in the government's possession.

Wood points to our opinion in *Courthouse News Service v. Planet*, 750 F.3d 776 (9th Cir. 2014), as support for the notion that there is a right of access to all records associated with public governmental proceedings. Although we observed that "[t]he federal courts of appeals have widely agreed that [the right of access] extends to civil proceedings and associated records and documents," we also acknowledged that only *public* records associated with a governmental proceeding—not all records and information associated with a proceeding—are subject to *Press-Enterprise II*. *Id.* at 786 ("[T]he right of access to *public records* and proceedings is necessary to the enjoyment of the right to free speech." (emphasis added)). *Courthouse News Service* thus cannot support Wood's position.

Wood does not cite a single case in which an appellate court has found a right of access to the type of information at

issue in this appeal. No other case has granted a First Amendment right to lot numbers. No other case has granted a First Amendment right to documents relied upon by a state agency in the development of an official policy.[4] In so doing, the majority dramatically expands the scope of the right of access in a way that causes what used to be a limited exception to swallow the default rule, which is that "the First Amendment . . . [does not] mandate[] a right of access to government information or sources of information within the government's control." *Houchins*, 438 U.S. at 15. How far does this newly expanded right reach? It is undisputed that the right of access extends to criminal trials. *Richmond Newspapers, Inc.*, 448 U.S. at 580. Does it now extend to all documents in the prosecutor's possession? Jury pool records? *See Jury Serv. Res. Ctr. v. De Muniz*, 134 P.3d 948 (Or. 2006) (rejecting such a claim).[5] Jurors' addresses? *See*

---

[4] Not only is the majority's position unsupported by a decision from any appellate court, it creates a circuit split with an opinion issued by the Eleventh Circuit just last month, *Wellons*, 2014 WL 2748316, at *6, and it is flatly inconsistent with an opinion issued by the Georgia Supreme Court two months ago, *Hill*, 758 S.E.2d at 805–06.

[5] Recognizing the distinction between "proceedings and documents filed therein" and information in the government's possession, the Oregon Supreme Court wrote:

[T]he Court of Appeals mistook access to a public trial for access to government information. The United States Supreme Court's emphasis in the *Press-Enterprise* cases was on access of the public to *the trial itself*, not on the process that lead to the selection of the actors in that event. Those cases establish that the public has a right to attend criminal trials. The selection of names for the list of prospective jurors, however, is one or more (sometimes several) steps removed from the trial itself. . . . Unlike actual trials, public access plays no significant role in the official and largely rote function of collecting and winnowing

*Commonwealth v. Long*, 922 A.2d 892 (Pa. 2007) (same). Of course not, but that is the implication of the majority's holding.[6]

And the principle doesn't improve by trying to confine today's rule to executions. Our decision in *California First Amendment Coalition* was an application of the Supreme Court's right of access to public proceedings. Today's ruling strikes out on its own. Either the majority's ruling has much broader implications, or it is Justice Roberts's famous "restricted railroad ticket, good for this day and train only." *Smith v. Allwright*, 321 U.S. 649, 669 (1944) (Roberts, J., dissenting).

V

Wood has not asserted a First Amendment right of access claim. But even assuming that he has, the question becomes whether the right attaches. This analysis is informed by two "complementary considerations": (1) "whether the place and

---

names for jury lists. . . . So understood, the dispute is far more analogous to cases in which the United States Supreme Court has ruled that the general public does not have a First Amendment right of access to places, information, and documents within the government's control than it is to the *Press-Enterprise* cases.

*Jury Serv. Res. Ctr.*, 134 P.3d at 954.

[6] The majority purports to limit its holding to information "inextricably intertwined" with execution. Maj. Op. at 13. That's a responsible sounding phrase. Unfortunately, the veneer of responsibility is only skin deep. If lot numbers and National Drug Codes are "inextricably intertwined," then documents in the prosecution's possession and jury pool records—which are far more relevant to a core public proceeding—are certainly "inextricably intertwined" as well.

process have historically been open to the press and general public" and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8–9.

## A. *Historically Open to the Press and General Public*

Wood seeks access to three broad categories of information: (1) manufacturer information, (2) information about the qualifications of ADC personnel, and (3) information about the manner in which ADC developed its two-drug protocol. Wood argues that the information that he seeks is analogous to information disclosed about different methods of execution in the past. For example, some old newspaper accounts include detailed information about ropes used for hangings and the tradesmen and companies that supplied them. Apparently, there was only one company west of the Mississippi that made lethal gas, and a newspaper once published an article on the manufacturer of the gas chambers. Wood points out that even today, the Pinal County Historical Museum displays twenty-eight nooses used for executions in Arizona.[7]

There are a number of reasons why Wood's historical evidence, relied upon by the majority, *see* Maj. Op. at 15–17, is insufficient. First, he has not shown a "historical *tradition* of public access" to the means of execution beyond what witnesses to the execution could see. *Cal. First Amendment Coal.*, 299 F.3d at 875 (emphasis added). Wood's historical evidence is best characterized as sporadic and anecdotal. The

---

[7]  *See* Pinal County Historical Soc. & Museum, *Our Exhibits*, www.pinalcountyhistoricalmuseum.org/exhibits.htm (last visited July 19, 2014).

fact that Godfrey Boger's obituary revealed that he made ropes for hangings tells us very little.[8] As does the fact that the Pinal County Historical Museum displays nooses today. Episodic and, at times, non-contemporaneous instances of public disclosure cannot establish a historical tradition of public access. If, in this area, we are not guided by the historical record, we have no guidance but our own sense of what we would like disclosed by the government.

Second, neither the majority nor Wood has shown that the *government* historically provided open access to the identities of a particular manufacturer. Indeed, several of his examples reveal that it was the manufacturers themselves who chose to publicize their identities. But the relevant consideration is whether the *government* has historically made the particular proceeding open to the public. *See Cal. First Amendment Coal.*, 299 F.3d at 875 ("When executions were moved out of the public fora and into prisons, *the states implemented procedures* that ensured executions would remain open to some public scrutiny." (emphasis added)). *Press-Enterprise II* stands for the proposition that if the government has traditionally made a certain proceeding public, it must continue to do so. By construing the right of public access more broadly than any court to date, the majority creates a perverse incentive for the government not to open "proceedings and documents filed therein" to the public in the first place so as not to bind itself going forward. Today's decision thus undermines the very purpose of the right of public access. If the government is further estopped from restricting access when private actors choose to make proceedings or records public, the government has an additional incentive to take steps to keep private actors from

---

[8] *See Made Hangman's Ropes*, The Gazette Times, July 16, 1911, at 13.

disclosing information regarding governmental proceedings and records. And what happens when the government's efforts fall short? Can individuals who are determined to disclose governmental information foist a First Amendment obligation on the government to grant access in the future by disclosing government secrets? Surely not. Edward Snowden's leaks are not relevant to the question of whether there is a First Amendment right of access to FISA court proceedings.

Third, although Wood claims that Arizona previously disclosed drug manufacturer information, Wood has not shown that the State voluntarily disclosed the specific type of manufacturer information that he seeks. Arizona has disclosed this information only pursuant to discovery or under court order. *See Schad v. Brewer*, No. CV-13-2001-PHX-ROS, 2013 WL 5551668 (D. Ariz. Oct. 7, 2013). Moreover, even if the State had at one time voluntarily disclosed such information, it does not a tradition make. The history of executions by lethal injection is relatively short, as the states have made adjustments to their protocols in response to developments, both public and scientific. Such disclosures do not demonstrate that the information Wood seeks has been historically available to the public.

Fourth, Wood has adduced no historical evidence—none—to support a right of access to two of the three types of information that he seeks: (1) information about qualifications of execution personnel, and (2) information about the manner in which ADC developed its two-drug protocol. As to the former, there is substantial evidence that information about personnel has not been historically available to the public. *See* Ellyde Roko, Note, *Executioner Identities: Toward Recognizing a Right to Know Who is*

*Hiding Beneath the Hood*, 75 Fordham L. Rev. 2791, 2829 (2007) (acknowledging that "[h]istorically, executioners have hidden behind a hood—both literally and figuratively."). And, as to the latter, information about the process by which a state entity developed a policy or program is the proper subject of statutory disclosure laws.

Wood has thus failed to establish a historical tradition of access to any of the information that he seeks. Although the lack of historical evidence may not foreclose a right of access, *Seattle Times, Co.*, 845 F.2d at 1516, this failing leaves Wood with a tough row to hoe. He would have to show that *Press-Enterprise II*'s second consideration "weighs heavily in favor" of his asserted right in order to overcome his failing on the first consideration. *Id*. And, as explained below, he cannot do so.

B.  *Access Plays a Significant Positive Role*

The second factor in determining whether there is First Amendment right of public access is "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8.

1.  Manufacturer's identity

Publicly disclosing the identity of the manufacturer of the drugs to be used in Wood's execution would not "play[] a significant positive role in the functioning" of Arizona's execution protocol. *Id.* In *California First Amendment Coalition*, we reasoned that "[a]n informed public debate is critical in determining whether execution by lethal injection comports with 'the evolving standards of decency which

mark the progress of a maturing society.'" 299 F.3d at 876 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). Here, the State has already disclosed the type of drugs that will be used in Wood's execution, the dosages of those drugs, their expiration dates, the fact that they are FDA approved, and the fact that they were produced domestically. The question before us is whether releasing the name of the manufacturer—or related information such as the National Drug Codes and lot numbers—would have a *significant* marginal benefit on the public discourse concerning Wood's execution *beyond the benefit that obtains from releasing the information already provided by the State*. *See Seattle Times*, 845 F.2d at 1516 ("The [Supreme] Court has examined whether public access plays a *particularly significant positive role in the actual functioning of the proceeding*." (emphasis added)).

The information already released by the State enables informed debate about the lawfulness and propriety of Arizona's two-drug cocktail. The public knows precisely how the State intends to end Wood's life and can investigate whether the drugs are suited to that purpose. Wood correctly points out that it is "of particular significance to the public to know that the State that is carrying out its execution process is doing so through unlawful means." But he does not—and cannot—explain why knowing the drugs' manufacturer would contribute to discussing whether Arizona's method is lawful. The identity of the chemicals and their quantities permits a full examination of the issue. Not every conceivable piece of information is equally relevant to the important, ongoing public conversation about the lawfulness of a particular lethal-injection protocol.

The only marginal benefit of disclosing the identity of the manufacturer of the drugs is that it enables the public to discuss the manufacturer's decision to supply Arizona with the chemicals used in an execution. There is certainly value in such knowledge. For example, consumers who are opposed to capital punishment might wish to avoid doing business with the manufacturers. But the fact that there are some discursive benefits to disclosing the identities of the manufacturers is hardly dispositive. We must also consider the costs of disclosing the information. As the Supreme Court aptly put it, "[a]lthough many governmental processes operate best under public scrutiny, it takes little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly." *Press-Enterprise II*, 478 U.S. at 8–9. The disclosure of information previously kept private by the government often enhances the scope or accuracy of public discourse in some way. But the disclosure of certain kinds of information also hobbles the state's ability to carry out its legitimate functions. When disclosure inhibits the effectiveness of the process at issue without producing substantial benefits, then public access to the information does not "play[] a significant *positive* role in the functioning of the particular process in question." *Id.* at 8.

Several courts have observed that disclosing the manufacturer of drugs used in executions inhibits the functioning of the process in ways that harm the state, its citizens, and the inmate himself. As the Georgia Supreme Court recently explained, "without the confidentiality offered to execution participants . . . there is a significant risk that persons and entities necessary to the execution would become unwilling to participate." *Hill*, 758 S.E.2d at 806. In a dissent from denial of rehearing en banc joined by seven other

members of our court, Chief Judge Kozinski observed that "Arizona has a legitimate interest in avoiding a public attack on its private drug manufacturing sources." *Landrigan v. Brewer*, 625 F.3d 1132, 1143 (9th Cir. 2010) (Kozinski, C.J, dissenting from denial of rehearing en banc). In Chief Judge Kozinski's view, Arizona had "good reasons" to keep the identity of the manufacturer private because a journalist suggested that the company might be criminally liable under a European Union regulation. *Id.*

Arizona's ability to enforce its execution protocol will be hindered if it cannot reliably obtain the drugs needed to perform executions. Disclosure of the information that is supposed to "play[] a significant *positive* role in the functioning of the particular process in question" might instead destroy the process altogether. *Press-Enterprise II*, 478 U.S. at 8 (emphasis added). Inmates may suffer if the State is forced to turn to less reliable execution methods that might inflict unnecessary pain. In a recent case, Texas disclosed the name of the compounding pharmacy that produced the chemicals to be used in an execution. *Whitaker v. Livingston*, No. H-13-2901, 2013 U.S. Dist. LEXIS 144367, at *7 (S.D. Tex. Oct. 7, 2013). The inmate "notified the court that the compounding pharmacy was demanding that Texas return the drugs because it was being harassed." *Id.* The inmate was not pleased about the prospect of additional public discourse concerning the drugs that would be used to end his life. Instead, he was understandably "worrie[d] that Texas may have to use a different drug to execute him." *Id.* State legislatures have responded to the possibility that no manufacturer will provide the drugs used in lethal injections. For example, Tennessee recently reauthorized the use of the electric chair as an alternative

method of execution in the event that the drugs necessary to perform a lethal injection become unavailable.[9]

Arizona had these developments in mind when it changed its protocol. A press release from the Arizona Attorney General explains that "compounding pharmacies in Texas and Oklahoma that had been providing pentobarbital for executions are now refusing to provide it after their identity was released publicly and they began to receive threats. This kind of reaction has caused companies that sell the drug to corrections' agencies to stop supplying it for the purposes of inmate executions."[10] For this reason, the press release describes the need for confidentiality as a "public safety issue." In the end, efforts to disclose the manufacturers' identities only renders the imposition of capital punishment more cruel than necessary by making it more difficult for states to reliably and safely execute inmates who were long-ago sentenced to death. Individuals like Wood, who have been lawfully tried and sentenced, are used as a means to accomplish a long-term policy objective that ought to be conveyed to state legislatures rather than federal courts.[11]

---

[9] *See* Tim Ghianni, *Tennessee Reinstates Electric Chair as Death Penalty Option*, May 23, 2014, *available at* http://www.reuters.com/article/2014/05/23/us-usa-tennessee-execution-idUSBREA4M03520140523.

[10] *See* Press Release, Attorney Gen. of Ariz., State of Arizona Announces Change to Lethal Injection Protocol (March 26, 2014), https://www.azag.gov/press-release/state-arizona-announces-change-lethal-injection-protocol.

[11] The majority thinks that exposing the names of the manufacturers of drugs used in lethal injections is especially important in light of the "seismic shift in the lethal injection world in the last five years" and the "flawed executions this year" involving the drugs at issue here. Maj. Op.

Finally, Wood contends that there is no record evidence in this case that disclosing the identity of the manufacturer will "extend the pressure on qualified suppliers not to supply the drugs." The majority likewise asserts that "the State can point to no evidence in the record to support its claim that pharmaceutical companies will stop providing drugs if this information is released." Maj. Op. at 21. But, in addition to the aforementioned case law, Wood's own brief cites multiple news reports detailing how companies have stopped supplying states with drugs used in executions after their identities have been disclosed. Such evidence is crucial to Wood's argument because it is the only indication that disclosure of the manufacturer's identity would "play[] a significant positive role in the functioning" of Arizona's execution process. *Press-Enterprise II*, 478 U.S. at 8. The majority also cites news reports as evidence that there has been a "seismic shift in the lethal injection world" as manufacturers have stopped providing thiopental and pentobarbital. Maj. Op. at 19. The majority considers the evidence that drug manufacturers are susceptible to public pressure for the proposition that disclosure creates a dialogue about capital punishment, but ignores the same evidence to the extent that it shows that disclosure potentially hinders the

---

at 19–20. But the "seismic shift" and "flawed executions" have been caused in part by past disclosures of the manufacturers of the drugs used in lethal injections that have made the drugs difficult or impossible to obtain. As the majority points out, "[s]tates are now seeking new types and combinations of drugs" because thiopental and pentobarbital are no longer readily available. Maj. Op. at 20. The majority identifies a policy development it deems undesirable—the need to use different and possibly less effective drugs to carry out lethal injections—and then interprets the First Amendment in a novel manner in order to exacerbate rather than ameliorate the problem.

State's ability to lawfully carry out its lethal-injection protocol by making the requisite drugs harder to obtain.

We do not know with certainty how the public or the drug manufacturer will react if Arizona discloses the manufacturer's identity. But we do know, from the case law and the arguments advanced by Wood himself, that disclosure might impact Arizona's ability to perform a lawful execution using domestically produced, FDA-approved drugs. When we compare the risk to Arizona's execution protocol to the alleged benefits of additional public discourse about the subject, it is clear that Wood cannot show that "public access plays a *significant positive role* in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8 (emphasis added).

2.  Executioners' qualifications

For much the same reason, publicly disclosing additional information about the qualifications of the individuals who will participate in Wood's execution would not "play[] a significant positive role in the functioning" of Arizona's execution protocol. *Id.* Wood contends that "information about the qualifications of the persons who will execute him—in the name of Arizona's citizens—is a matter that is squarely within the sphere of 'informed public debate.'" Even if that is true, it is not the issue before us. Once again, the State has already disclosed ample information about the qualifications of those who will participate in the execution. The State informed Wood that the Inspector General had verified the qualifications of the personnel and that a central femoral line would only be inserted by a person licensed or certified to perform the procedure. The question is thus whether disclosing the specific qualifications of the actual

individuals chosen by the State to conduct the execution would have a *significant* marginal benefit on the public discourse concerning Wood's execution *beyond the benefit that obtains from releasing the information already provided by the State*.

As with the drug manufacturer's identity, the information offered by the State related to the executioners' qualifications enables informed debate about the lawfulness and propriety of Arizona's execution protocol. The public knows what qualifications are required of medical personnel who participate in the execution and how those qualifications are verified. Wood does not—and cannot—explain how the public's knowledge of, say, the medical school or nursing school attended by each person participating in the execution, would "play[] a significant positive role in the functioning of the particular process in question." *Id.*  Such information is, at best, irrelevant.

The only way such information could meaningfully contribute to public discourse is if specific information about the qualifications of the personnel allowed for members of the public to identify them. The names of the individuals who take part in the execution, like the names of the companies that manufacture the drugs used in the execution, would certainly contribute to public debate. Members of the public could, for example, protest outside their homes or offices. Reporters could call and ask them about why they decided to participate in an execution. The problem, of course, is that this kind of public discourse would not "play[] a significant *positive* role in the functioning of the particular process in question." *Id.* (emphasis added). Rather, it would severely inhibit Arizona's ability to conduct lawful executions by making it difficult to find qualified personnel willing to risk

their privacy and their careers to participate in an execution. *See Hill*, 758 S.E.2d at 805 ("The reasons for offering such privacy are obvious, including avoiding the risk of harassment or some other form of retaliation from persons related to the prisoners or from others in the community who might disapprove of the execution as well as simply offering those willing to participate whatever comfort or peace of mind that anonymity might offer."). Arizona's confidentiality statute responds to these precise concerns. Ariz. Rev. Stat. § 13-757(C) ("The identity of executioners and other persons who participate or perform ancillary functions in an execution and any information contained in the records that would identify those persons is confidential.").

Wood correctly points out that we cannot know whether disclosing the qualifications of the individuals participating in the execution will lead to the discovery of their names and other personal information. But the mere possibility that this might occur would dissuade qualified individuals from performing a lawful task on behalf of the State and its citizens. *Cf. Long*, 922 A.2d at 904–05 (Pa. 2007) (holding that the First Amendment right of public access does not extend to jurors' addresses in part because the disclosure of such information "may make the average citizen less willing to serve on a jury, especially if he or she believes that the media, the defendant, or the defendant's family and friends know where he or she lives"). As with the ongoing efforts to deter drug companies from producing the compounds that most quickly and painlessly cause death, attempts to dissuade qualified medical personnel from participating in lawful executions will likely only harm inmates sentenced to die by forcing states to rely on less experienced professionals.

Disclosing more specific details about the qualifications of the individuals who participate in the execution process risks interfering with the legitimate operation of Arizona's execution protocol without meaningfully contributing to the public discourse surrounding Wood's execution.

### 3.  Development of protocol

Lastly, Wood has not shown that disclosing information about how ADC developed its execution protocol will have any effect whatsoever on public dialogue about the subject. The thirty-two page protocol sets out in precise detail how an execution will proceed. The two-drug portion of the protocol includes the type and quantity of drugs that will be used along with a nine-step process for administering the drugs. Anyone who reads the protocol will know exactly how Arizona plans to carry out an execution. Wood does not suggest what might be gleaned from reviewing information generated during the protocol's development, let alone how access to such information will "play[] a *significant positive* role in the functioning" of an execution. *Press-Enterprise II*, 478 U.S. at 8 (emphasis added).

In sum, Wood has not shown a historical tradition of public access to the information that he seeks, and he cannot show that such access would play a significant positive role in the functioning of the State's administration of lethal injection. Accordingly, he has no First Amendment right to access the information and he cannot show a likelihood of success on the merits.

VI

The parties and the district court understandably focused primarily on the likelihood that Wood's First Amendment claim will succeed on the merits. But we must also consider the other factors that comprise the preliminary injunction analysis, in particular the likelihood of irreparable harm in the absence of preliminary relief. *See Winter*, 555 U.S. at 20.

No one doubts that Wood "has a strong interest in being executed in a constitutional manner." *Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011). But the right asserted by Wood differs from the constitutional challenges often raised by inmates facing execution. The First Amendment right of public access inheres in all of the members of the public, and not just the inmate who has been sentenced to death. *See Cal. First Amendment Coal.*, 299 F.3d at 873 ("[T]he First Amendment guarantees the *public*—and the press—a qualified right of access to governmental proceedings." (emphasis added)). The fact that Wood will soon be executed absent judicial intervention does not necessarily mean that there will likely be "irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Wood's claim is premised on the notion that society will have a richer discourse about his execution if everyone is made aware of certain details, such as the manufacturer of the drugs used and the qualifications of the executioners employed. It is not self-evident that the First Amendment right will be irreparably harmed if that information is not disclosed before Wood's execution, but is instead disclosed only if the view espoused by Wood ultimately prevails after the case is fully litigated. Whatever benefit society derives from being able to discuss who made the drug and who injected it would presumably

still inure to the public if that conversation occurred after Wood has been executed.

Despite the impression offered by the substance of the briefs and opinions in this case, this litigation is not really about the scope of the First Amendment right of the public to access certain information pertaining to an execution. The existence and scope of that right could be fully litigated by a member of the public who feels he has been unconstitutionally deprived of the information at issue. *See Wellons*, 2014 WL 2748316, at *6 (holding that the purported First Amendment right of public access to information about the manufacturer of drugs used in an execution and the identities of the executioners "turn[s] on the public's, rather than the individual's, need to be informed so as to foster debate").

And, despite the impression offered by the majority's disposition, this litigation is not even about staying Wood's execution. Arizona now faces a difficult choice. The State can continue to enforce its confidentiality statute and refrain from executing Wood or anyone else until it prevails on the merits, as seems quite likely. Or, the State can disclose the information required by the majority and execute Wood, knowing that it might be impossible to obtain the drugs necessary to carry out future lawful executions once the identity of the manufacturer is no longer confidential. Either way, the First Amendment has been co-opted as the latest tool in this court's ongoing effort to bar the State from lawfully imposing the death penalty.

VII

The decision to inflict the death penalty is a grave and solemn one that deserves the most careful consideration of the public, the elected branches of government, and the courts. We must be cognizant that a life is at stake. But we cannot conflate the invocation of a constitutional right belonging to the public at-large—such as the First Amendment right of public access to certain proceedings and documents—with a policy judgment about if and when the death penalty ought to be imposed. In so doing, we usurp the authority of the Arizona legislature and disregard the instructions of the Supreme Court.

The district court did not abuse its discretion when it denied Wood's request for a preliminary injunction. I would affirm the district court's judgment.

I respectfully dissent.