Argued and submitted January 10, decision of Court of Appeals reversed; judgment
of circuit court affirmed April 27, reconsideration denied May 23, 2006

JURY SERVICE RESOURCE CENTER;
David Shannon; and Robert Paul Langley, Jr.,
*Respondents on Review,*

*v.*

Paul J. DE MUNIZ;
Kingsley Click,
Office of the State Court Administrator,
Oregon Judicial Department;
Paul Lipscomb;
James Murchison,
Office of the Marion County Circuit Court
Trial Court Administrator;
Dale Koch;
Douglas Bray,
Office of the Multnomah County Circuit Court
Trial Court Administrator;
Robert Huckleberry;
Nancy Lamvick,
Office of the Lincoln County Circuit Court
Trial Court Administrator;
Bill Bradbury; Roy Turnbaugh;
and State of Oregon,
*Petitioners on Review.*

(CC 03C-11907; CA A122978; SC S52571)

134 P3d 948

Erika L. Hadlock, Assistant Solicitor General, Salem, argued the cause and filed the brief for petitioners on review. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Rose Jade, Newport, argued the cause and filed the brief for respondents on review.

Before Gillette, Presiding Justice, and Durham, Riggs, Balmer and Kistler, Justices.**

GILLETTE, J.

---

** De Muniz, C. J., and Carson, J., did not participate in the consideration or decision of this case.

## GILLETTE, J.

This matter requires us to determine the extent to which the data compiled and used by various public entities and officers in the process of selecting trial juries may be obtained by a member of the public. Plaintiffs, as members of the public,[1] initially sought to gain access to that information (hereinafter collectively referred to as "jury pool records") by requesting it from the Oregon Judicial Department, which uses the data to compile the lists from which trial juries are chosen. When their requests were unsuccessful, plaintiffs filed the present case in circuit court. The circuit court granted summary judgment to defendants and dismissed the complaint. The Court of Appeals reversed. *Jury Service Resource Center v. Carson*, 199 Or App 106, 110 P3d 594 (2005). We allowed defendants' petition for review and now reverse the decision of the Court of Appeals and affirm the judgment of the circuit court.

The Court of Appeals set out the facts as follows:

"Plaintiffs are Jury Services Resource Center (JSRC), a nonprofit organization interested in auditing the Lincoln County Circuit Court's jury pool selection process; Shannon, a citizen interested in scholarly research into the state's jury pool selection process and a potential juror in Multnomah County; and Langley, a man who has been convicted of aggravated murder and was awaiting a retrial of the penalty phase in that case in Marion County. Defendants are the State of Oregon and various state officials in the judicial and executive branches.

"The dispute in this case centers on jury pool records consisting of 'source lists,' 'master lists,' and 'term lists.' 'Source lists' are lists provided to the State Court Administrator by county election officials and by Department of Transportation officials, as well as 'any other sources approved by the Chief Justice of the Supreme Court that will furnish a fair cross section of the citizens of the county.' ORS 10.215(1). 'Master lists' are 'names selected at random from the source lists' at the direction of the State Court Administrator. *Id.* The master lists contain not only the

---

[1] Plaintiff Langley presently is the defendant in a pending aggravated murder case, but he does not rely on that status in this proceeding.

names of prospective jurors but also their addresses. ORS 10.215(4). 'Term lists' or 'term jury lists' are names and addresses 'selected at random from the master jury list * * * at the direction of the presiding judge for the judicial district or clerk of court' using a method prescribed by the presiding judge of each judicial district. ORS 10.205(2); ORS 10.225(1). Because term lists are chosen before a term begins, the composition of any term list is always complete before the beginning of a trial at which a jury chosen from the term list might sit. ORS 10.225(1).

"JSRC and Langley requested that court officials from, respectively, Lincoln County and Marion County disclose to them the contents of source lists, master lists, and term lists[, asserting, *inter alia*, that the lists were public records.] When the county judicial officials denied plaintiffs' requests, [plaintiffs] appealed to the Attorney General. *See* ORS 192.450 (Attorney General reviews denial of public record requests). He, too, denied the petitions, explaining that the requested records were exempt from disclosure under the [Public Records Law]. JSRC and Langley then consolidated their various claims and sought judicial review under ORS 192.490 in Marion County Circuit Court. Shannon, who had never filed a request for any documents, was joined as a plaintiff; his claim was for declaratory judgment under ORS 28.010. Instead of responding to plaintiffs' complaint with an answer, defendants moved for summary judgment. *See* ORCP 47 B (party against whom a claim is brought may move for summary judgment 'at any time'). Concluding that defendant's denials did not violate the [Public Records Law] or any constitutional provisions raised by plaintiffs, the trial court granted defendants' motion for summary judgment, rejected a subsequent 'motion for reconsideration,' and entered judgment for defendants."

*Jury Service*, 199 Or App at 109-10 (footnote omitted). As noted, plaintiffs appealed the adverse judgment to the Court of Appeals.

In its opinion, the Court of Appeals rejected plaintiffs' statutory arguments under the Oregon Public Records Law, ORS 192.410 to 192.505, and their arguments under the Oregon Constitution, including Article I, section 8 (free speech), section 10 (open courts), and section 20 (equal privileges and immunities). *Jury Service*, 199 Or App at 112-16.

However, the Court of Appeals agreed with plaintiffs' argument that they were entitled to access to jury pool records under the First Amendment to the United States Constitution.[2] Using a test of "experience and logic" that the United States Supreme Court has announced as the standard in disputes involving the openness of judicial proceedings, the Court of Appeals concluded that all stages of the jury selection process presumptively are open, including the collection of names for preliminary lists such as the jury pool records in this matter. *Jury Service*, 199 Or App at 120-23.

Based on a brief historical survey, the Court of Appeals concluded that jury selection traditionally has been an open process. The court noted that, at common law, the sheriff wrote names of qualified landowners on a sheet of paper and summoned the listed men to appear at trial. That process, the court declared, was "conducted in public." *Id.* at 121. The court also recited some evidence suggesting that, in the past, jury lists were available to the public in Oregon. *Id.* at 121-22. In terms of whether public access plays a significant role in the process at hand, the Court of Appeals dismissed the idea that the process by which jury lists are created could be separated analytically from the trial itself. The issue, the Court of Appeals stressed, involved both fairness in fact in the jury selection process and also the appearance of fairness. *Id.* at 122.

Based on that reasoning, the Court of Appeals concluded that the jury pool records should be presumed to be public and, the court went on to state, "[u]nder a system such as Oregon's, in which the particular jury ultimately empaneled in any given trial is drawn randomly from a pool that is itself selected before a jury term, adequate protection of the public's right (as well as the defendant's and potential jurors' rights) must begin at the source of the process itself, at the aptly named 'source lists.'" *Id.* at 122-23. The Court of Appeals further opined, "Opening *voir dire* does not alone suffice to guarantee that a jury is untainted, because taint at the source could flow forward at each subsequent step. Thus,

---

[2] The First Amendment to the United States Constitution provides, in part: "Congress shall make no law * * * abridging the freedom of speech, or of the press * * *."

to protect the values guaranteed by the First Amendment right of access to the jury selection process, that process must be open from the first step." *Id.* at 123. Notwithstanding that conclusion, however, the court left the door open for defendants to deny plaintiffs access to the records that they seek, at least in cases in which there is a showing that denying public access serves a higher interest and the restriction, if any, is narrow in scope. *Id.* We allowed defendants' petition for review.

■　　We begin our own analysis by stating that, plaintiffs' arguments to the contrary notwithstanding, the Court of Appeals did not err in rejecting plaintiffs' arguments respecting the Public Records Law and Article I, sections 8, 10, and 20, of the Oregon Constitution. We agree with the fundamentals of the analysis that that court employed in rejecting those claims, and see no purpose to be served by paraphrasing the analysis here. We therefore confine our discussion to the proposition that the Court of Appeals accepted, namely, plaintiffs' contention that the First Amendment to the United States Constitution requires defendants to give plaintiffs full access to jury pool records, including source lists, master lists, and jury term lists.

■　　In a line of cases issued over the past quarter century, the United States Supreme Court has established that the First Amendment encompasses a public right to observe the workings of at least some parts of the administration of justice, particularly criminal trials. Consequently, trials must be conducted openly with full access to the public. "The right of access to places traditionally open to the public, as criminal trials have long been, may be seen as assured by the amalgam of the First Amendment guarantees of speech and press; and their affinity to the right of assembly is not without relevance." *Richmond Newspapers, Inc. v. Virginia,* 448 US 555, 577, 100 S Ct 2814, 65 L Ed 2d 973 (1980) (plurality opinion). The First Amendment ensures access to criminal trials because of a "common understanding that 'a major purpose of that Amendment was to protect the free discussion of governmental affairs.' " *Globe Newspaper Co. v. Superior Court,* 457 US 596, 604, 102 S Ct 2613, 73 L Ed 2d 248 (1982), *quoting Mills v. Alabama,* 384 US 214, 218, 86 S Ct 1434, 16

L Ed 2d 484 (1966). "Thus to the extent that the First Amendment embraces a right of access to criminal trials, it is to ensure that this constitutionally protected 'discussion of governmental affairs' is an informed one." *Id.* at 604-05. The administration of justice, and criminal trial proceedings in particular, the Supreme Court has emphasized, entail a significant governmental function that must remain open to public scrutiny:

> "[T]he right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole. Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole. Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process. And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process — an essential component in our structure of self-government. In sum, the institutional value of the open criminal trial is recognized in both logic and experience."

*Id.* at 606 (footnotes omitted).

Subsequent cases, such as *Press-Enterprise Co. v. Superior Court*, 464 US 501, 104 S Ct 819, 78 L Ed 2d 629 (1984) (*Press-Enterprise I*) and *Press-Enterprise Co. v. Superior Court*, 478 US 1, 106 S Ct 2735, 92 L Ed 2d 1 (1986) (*Press-Enterprise II*), have clarified the scope and applicability of the aforesaid principles. Like their predecessors, those cases involved efforts by the news media, who claimed to represent the public, to gain access to certain parts of trial court proceedings. In *Press-Enterprise I*, a California state trial court closed the *voir dire* questioning of individual potential jurors to the public during a murder trial. Balancing the interest in governmental transparency against the privacy of individual jurors' discussions of sensitive personal experiences, the trial court later ruled that the transcripts of *voir dire* also would not be released to the public. The case eventually made its way to the United States Supreme Court, which vacated the trial court's rulings. The Court stated:

"The process of juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice system." 464 US at 505. According to the Court, "historical evidence * * * reveals that, since the development of trial by jury, the process of selection of jurors has presumptively been a public process with exceptions only for good cause shown." *Id.* In particular, the court expressed its concern that the trial court had opened only three days of a six-week *voir dire* process to the public and had refused to release the transcript of the closed parts of the proceeding, even though most of the information elicited during *voir dire* was not sensitive in nature. *Id.* at 513.

In *Press-Enterprise II*, a California state court excluded the public from a preliminary hearing in a murder case. Under then-existing California law, preliminary hearings were generally open to the public, but the magistrate could exclude the public if exclusion were necessary to protect the defendant's right to a fair and impartial trial. In *Press-Enterprise II*, the magistrate had granted the defendant's motion (which the state had not opposed) to exclude the public, including the news media. On the appeal of the excluded media, the United States Supreme Court again reversed. The Court observed that its cases under the First Amendment right of access to criminal proceedings had emphasized the history of open criminal trials and the positive role of that openness. 478 US at 8-9. Referring back to its discussion in earlier cases summarizing the history of openness in criminal trials and jury selection, and its salutary effect on both basic fairness and the appearance of fairness of the criminal trial, the Court stated:

> "These considerations of experience and logic are, of course, related, for history and experience shape the functioning of governmental processes. If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches. But even when a right of access attaches, it is not absolute. * * * While open criminal proceedings give assurances of fairness to both the public and the accused, there are some limited circumstances in which the right of the accused to a fair trial might be undermined by publicity."

*Press-Enterprise II*, 478 US at 9 (citation omitted). Historically, the Court observed, preliminary hearings generally have been held in open court where the public may attend. *Id.* at 10. In addition, the Court concluded that public access to preliminary hearings "plays a particularly significant positive role in the actual functioning of the process." *Id.* at 11-12. The Court noted that *Richmond Newspapers, Globe Newspaper*, and *Press-Enterprise I* established that public access to criminal trials and to jury selection at those trials "is essential to the proper functioning of the criminal justice system," and that "California preliminary hearings are sufficiently like a trial to justify the same conclusion." *Id.* at 12. It followed that the California court had erred in closing the preliminary hearing to the public. *Id.* at 15.

Read together, *Richmond Newspapers, Globe Newspaper, Press-Enterprise I*, and *Press-Enterprise II* establish that certain forms of judicial proceedings may be characterized as "presumptively open," based on history and function. The historical record indicates whether the process has been one that was open to the press and general public, and the particular function of the process within the broader criminal trial context determines whether public access plays a significant positive role. *Press-Enterprise II*, 478 US at 8-9. If the test of experience and logic is satisfied, then the particular process is presumptively open. Nevertheless, a party successfully may overcome that presumption of openness by demonstrating an overriding interest, *i.e.*, by a showing that closure is essential to preserve "higher values" and is "narrowly tailored to serve that interest." *Id.* at 9-10, 13-14.

With the foregoing guidelines in mind, we turn to a determination whether the principles to be derived from the *Press Enterprise* cases and their predecessors dictate the conclusion that the Court of Appeals reached in this case.

They do not. Although historical evidence supports the idea that trials, including the process of selecting particular jurors at the threshold of trial, were open to the public, *Press-Enterprise I*, 464 US at 505-10, the process of selecting potential jurors has never been open in that way. At English common law, the task of preliminarily selecting jurors was delegated to the discretion of a trusted public official, namely,

the sheriff. *See* Sir Matthew Hale, *The History of the Common Law of England* 337 (6th ed 1820) (describing role of sheriff). Under that system, the sheriff enjoyed enormous discretion in deciding how to select trial jurors. *See* William L. Murfree, *A Treatise On the Law of Sheriffs and Ministerial Officers* 177 (2d ed 1890) ("There seems to have been no limitation on [the sheriff's] choice.").

In the United States, however, legislatures in the nineteenth century created statutory procedural standards for identifying potential jurors that were less discretionary. Generally speaking,

"[t]he statutes usually specif[ied] the number [of jurors] to be annually selected in each county, which selection is made by town authorities, county courts, county commissioners, or other officers, and the list so prepared is transmitted to the clerk of the county or circuit court, where it is filed, and the names copied upon slips of paper which are placed in the jury box ready for the drawing."

Seymour D. Thompson & Edwin G. Merriam, *A Treatise on the Organization, Custody and Conduct of Juries, Including Grand Juries* 41 (1882). Even if we were to assume from the foregoing that the American experience could be characterized as more "open," in the sense that certain statutes restricted discretion, we know of no authority that permitted members of the public to scrutinize any preliminary or tentative lists that may have led to the final one. Certainly, there is no historical support for the kind of openness that plaintiffs demand.

The next question under the United States Supreme Court's cases is whether public access to jury lists "plays a particularly significant positive role in the actual functioning of the process." *Press-Enterprise II*, 478 US at 11. As noted, the United States Supreme Court has emphasized the function of openness in criminal trials, in which the public may observe the process. "The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known." *Press-Enterprise I*, 464 US at 508

(emphasis in original). That is, criminal trials should be conducted openly, with an audience, so that the public may verify that the government is acting fairly in prosecuting defendants. But does that unremarkable proposition respecting the trial process itself translate into a requirement of transparency throughout the multi-step, pretrial process that produces a panel of venire to serve at the trial?

We think not. We note especially that, in concluding that public participation plays a role in the governmental function of selecting names for jury lists, and that a qualified right to jury records therefore falls within the protections of the First Amendment, the Court of Appeals proceeded from several dubious premises. First, it asserted that, "although access to jury lists is not the same as access to *voir dire*, the differences are not significant." *Jury Service*, 199 Or App at 120. Second, it opined that the timing of the process of compiling jury lists is of no importance, even though, "[w]hen that process [of compiling juror information] takes place, the term during which the selected jurors will sit has not begun." *Id.* at 122. Third, the Court of Appeals concluded that, because the jury selection process at trial is open to the public, "that process must be open from the first step." *Id.* at 123.

The best way that we can summarize our criticism of the foregoing is to say that the Court of Appeals mistook access to a public trial for access to government information. The United States Supreme Court's emphasis in the *Press-Enterprise* cases was on access of the public *to the trial itself*, not on the process that led to the selection of the actors in that event. Those cases establish that the public has a right to attend criminal trials. The selection of names for the list of prospective jurors, however, is one or more (sometimes several) steps removed from the trial itself. Unlike the *Press-Enterprise* cases, plaintiffs here do not assert a right to view a process, such as a trial, but instead demand to see a work product that government employees have created pursuant to statutory directives. *See* ORS 10.215 (describing creation of master list); ORS 10.225 (describing creation of term jury lists). Unlike actual trials, public access plays no significant role in the official and largely rote function of collecting and winnowing names for jury lists.

In fact, as plaintiffs themselves have framed it, this dispute actually is about plaintiffs' asserted right to examine the work product of governmental officials, after those officials have combed through official records and made selections from lists of names to determine which citizens might be called for jury duty and which ones will not. So understood, the dispute is far more analogous to cases in which the United States Supreme Court has ruled that the general public does not have a First Amendment right of access to places, information, and documents within the government's control than it is to the *Press-Enterprise* cases. *See, e.g., Los Angeles Police Department v. United Reporting Publishing Corp.*, 528 US 32, 120 S Ct 483, 145 L Ed 2d 451 (1999) (First Amendment does not require police department to release arrestees' addresses to general public); *Houchins v. KQED, Inc.*, 438 US 1, 89 S Ct 2588, 57 L Ed 2d 553 (1978) (First Amendment does not give journalists right to photograph jail facilities). In our view, the *Press-Enterprise* cases do not support plaintiffs' theory, and we know of no other source of law that will better serve them.

We conclude that there is no right of access under the First Amendment to jury pool records of the kind sought here. As previously noted, we have considered the parties' other arguments not premised on the First Amendment and agree with the Court of Appeals that those arguments are not well taken. It follows that the trial court's grant of summary judgment to defendants was correct. The Court of Appeals erred in ruling to the contrary.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.