BYBEE, Circuit Judge,
dissenting:
Arizona intends to execute Joseph R. Wood III on July 23, 2014. On the eve of his execution, Wood asserts a generalized First Amendment right of public access to information in the government’s possession regarding the State’s supplier of lethal drugs, its execution personnel, and the manner in which the State developed its lethal-injection protocol. Wood asks this court to stay his execution pending the resolution of his request for information. The majority not only finds that Wood’s novel First Amendment argument will likely prevail, but also that he is entitled to a stay of his execution until the State complies. Both are unprecedented.
The majority’s newfound right of access is a dramatic extension of anything that we or the Supreme Court have previously recognized, and it is in direct conflict with a very recent decision of the Eleventh Circuit, Wellons v. Comm’r, Ga. Dep’t of Corr., No. 14-12663-P, 2014 WL 2748316, 754 F.3d 1260 (11th Cir. June 17, 2014), and a recent decision of the Georgia Supreme Court, Owens v. Hill, 758 S.E.2d 794 (Ga.2014). The remedy is equally novel. Even if there were a First Amendment right of access, Wood would have no more right to the information than any other member of the public. It is unthinkable that if anyone else had brought this suit we would stop a lawful execution until the State yielded the information.
The majority has charted a new course, one I cannot follow. I respectfully dissent.
I
Wood shot and killed his estranged girlfriend, Debra Dietz, and her father, Eugene Dietz, on August 7, 1989, at a Tucson automotive paint and body shop owned and operated by the Dietz family. A jury convicted Wood of two counts of first-degree murder and two counts of aggravated assault. He was then sentenced to death. See Wood v. Ryan, 693 F.3d 1104 (9th Cir.2012).
On March 26, 2014, the Arizona Attorney General announced that the Arizona Department of Corrections (ADC) had changed its lethal-injection protocol to allow for the use of a two-drug protocol using midazolam and hydromorphone in carrying out executions.[1] The Attorney *1089 General explained that the State could no longer reliably obtain pentobarbital to perform lethal injections because when the identities of pentobarbital manufacturers were disclosed publicly, some manufacturers received threats and became unwilling to supply pentobarbitral to state corrections’ agencies. This created a public safety issue as ADC was compelled to seek alternative lethal drugs.[2]
On April 22, 2014, the State moved for a warrant of execution for Wood.[3] That same day, the State sent a letter to Wood’s counsel informing her that ADC would use the two-drug protocol for the execution. The State also indicated that if ADC could obtain pentobarbital, ADC would provide notice of its intent to use that drug.
On April 30, 2014, Wood’s counsel sent ADC a letter requesting (1) information regarding the provenance of ADC’s mi-dazolam and hydromorphone, (2) an explanation of ADC’s continuing search for pen-tobarbital, (3) information regarding the Drug Enforcement Administration (DEA) qualifications of ADC personnel who would participate in Wood’s execution, and (4) an explanation of how ADC developed its two-drug protocol.
On May 6, 2014, ADC replied, indicating that the drugs were “domestically obtained” and “FDA approved.” ADC declined to provide further information about the drugs based on ADC’s interpretation of Arizona’s executioner-confidentiality statute, Ariz.Rev.Stat. § 13-757(C). ADC noted that it continued to look for pento-barbital and would inform Wood if it obtained the drug. ADC also declined to provide specific information about the DEA qualifications of the execution personnel, but stated that “the qualifications for the IV team as set forth in Department Order 710.02-1.2.5 have not changed since the ADC amended the protocol in September, 2012, to include assurances of the IV team’s qualifications.” Finally, ADC stated that the development of ADC’s two-drug protocol was based on affidavits and testimony in Case No. 2:11-CV-1016, in the Southern District of Ohio.
On May 9, 2014, Wood’s counsel responded, seeking clarification and requesting the specific Ohio documents referenced in ADC’s letter. Counsel again requested the qualifications of the personnel who would participate in Wood’s execution, as well as evidence demonstrating that ADC had verified those qualifications.
On May 15, 2014, Wood’s counsel sent another letter, again asking for the DEA and medical qualifications of ADC personnel, along with information about the development of ADC’s two-drug protocol. Counsel also requested documents regarding correspondence with various state and federal agencies.
On June 6, 2014, ADC sent Wood a response in which it provided copies of purchase orders, invoices, and order confirmations for the midazolam and hydro-morphone. Although the documents reveal the drug names and expiration dates — September and October 2015 — information about the manufacturers and suppliers of the drugs was redacted. ADC also stated that the Inspector General had verified the qualifications of ADC personnel, both before and after issuance of Wood’s warrant of execution, and that in the event a central femoral line were used, *1090 it would be placed by a person currently licensed or certified to do so. ADC declined to provide copies of the Ohio documents, asserting that because the Federal Public Defender’s Office was involved in the Ohio litigation, Wood’s counsel — the Federal Public Defender — would already have access to them.
On June 26, 2014, Wood filed a civil rights complaint alleging three claims: (1) a violation of the First Amendment right of access to the courts, (2) a violation of the First Amendment right of access to governmental proceedings, and (3) a Supremacy Clause violation based on ADC’s alleged failure to follow the Food, Drug, and Cosmetics Act in adopting its lethal-injections protocol.
On June 28, 2014, Wood received final notice from ADC that it would use the two-drug protocol for his execution. Wood then filed a motion for a preliminary injunction on July 2, 2014, based only on his right of access to governmental proceedings claim. The district court denied that motion on July 10, 2014, reasoning that Wood could not show a likelihood of success on the merits because he has no First Amendment right of access to the specific information that he seeks. Wood filed a timely notice of appeal.
II
“A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest.” Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Under the “serious questions” version of this test articulated by our court, “a preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of the hardships tips strongly in the plaintiff’s favor.” Towery v. Brewer, 672 F.3d 650, 657 (9th Cir.2012). The “serious questions” version “requires that the elements of the preliminary injunction test be balanced, so that a stronger showing of one element may offset a weaker showing of another.” Id.
In the context of a capital case, the Supreme Court has emphasized that these principles apply when a condemned prisoner asks a federal court to enjoin his impending execution because “[fliling an action that can proceed under § 1983 does not entitle the complainant to an order staying an execution as a matter of course.” Hill v. McDonough, 547 U.S. 573, 583-84, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006). Rather, “a stay of execution is an equitable remedy” and “equity must be sensitive to the State’s strong interest in enforcing its criminal judgments without undue interference from the federal courts.” Id. at 584, 126 S.Ct. 2096. We review the denial of a preliminary injunction for abuse of discretion. Towery, 612 F.3d at 657.
Ill
“Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government’s control.” Houchins v. KQED, Inc., 438 U.S. 1, 15, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (plurality opinion). Thus, “[a]s a general rule, citizens have no first amendment right of access to traditionally nonpublic government information.” McGehee v. Casey, 718 F.2d 1137, 1147 (D.C.Cir.1983). Open meetings laws, such as the Government in the Sunshine Act, 5 U.S.C. § 552b, and public records acts, such as the Freedom of Information Act, 5 U.S.C. § 552, provide persons with a broad, statutory right of access to govern *1091 ment proceedings and documents. But, in general, the right of access is statutory, not constitutional, in nature: “[The Supreme] Court has repeatedly made clear that there is no constitutional right to obtain all the information provided by FOIA laws.” McBurney v. Young, — U.S. -, 133 S.Ct. 1709, 1718, 185 L.Ed.2d 758 (2013).
The Supreme Court has recognized a qualified First Amendment right of access to some governmental proceedings, principally those related to the courts. See Press-Enter. Co. v. Superior Court, 478 U.S. 1, 8-14, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (“Press-Enterprise II”); Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 603-11, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 579, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). “Underlying th[is] First Amendment right of access ... is the common understanding that a major purpose of that Amendment was to protect the free discussion of governmental affairs.” Globe Newspaper, 457 U.S. at 604, 102 S.Ct. 2613 (internal quotation marks and citation omitted). The Court has applied the right of public access to proceedings in criminal trials, including preliminary hearings, Press-Enterprise II, 478 U.S. at 8-14, 106 S.Ct. 2735, voir dire, Press-Enter. Co. v. Superior Court, 464 U.S. 501, 510-11, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (“Press-Enterprise I ”), the testimony of the child victim of a sex offense, Globe Newspaper Co., 457 U.S. at 603-11, 102 S.Ct. 2613, and criminal trials in general, Richmond Newspapers, Inc., 448 U.S. at 580, 100 S.Ct. 2814. We have explained that this qualified First Amendment right of access applies to “criminal proceedings and documents filed therein,” CBS, Inc. v. U.S. Dist. Court, 765 F.2d 823, 825 (9th Cir.1985), and have said that it extends to pretrial release proceedings, Seattle Times Co. v. U.S. Dist. Court, 845 F.2d 1513, 1517 (9th Cir.1988), and pretrial suppression hearings, United States v. Brooklier, 685 F.2d 1162, 1170-71 (9th Cir.1982). We have limited the right of access to “documents filed therein” to documents that transcribe or memorialize official proceedings: transcripts of closed hearings that occurred during jury deliberations, Phoenix Newspapers, Inc. v. U.S. Dist. Court, 156 F.3d 940, 949 (9th Cir.1998), plea agreements and related documents, Oregonian Publ’g Co. v. U.S. Dist. Court, 920 F.2d 1462, 1465-66 (9th Cir.1990), and pretrial release documents, Seattle Times Co., 845 F.2d at 1517.
In California First Amendment Coalition v. Woodford, 299 F.3d 868 (9th Cir.2002), we extended these cases to reach the conclusion that “the public enjoys a First Amendment right to view executions from the moment the condemned enters the execution chamber” to the time he is pronounced dead. Id. at 877. We arrived at this conclusion after addressing the considerations set forth in Press-Enterprise II: (1) “whether the place and process have historically been open to the press and general public,” and (2) “whether public access plays a significant positive role in the functioning of the particular process in question.” Press-Enterprise II, 478 U.S. at 8-9, 106 S.Ct. 2735. First, we found that there is a public right to view execution proceedings because “[hjistorically, executions were open to all comers.” Cal. First Amendment Coal., 299 F.3d at 875. We observed that even when California abolished public executions, it provided that official witnesses should be present at the execution, a practice followed by every state that authorizes the death penalty. Id. Second, we found that “[^Independent public scrutiny [of the execution proceeding] ... plays a significant role in the proper functioning of capital punishment.” Id. at 876. We explained that “public observation of executions fosters the same sense of catharsis that public observation of criminal trials fosters.” Id. at 877. No *1092 tably, we said nothing about the public’s right to gain access to any documents related to the execution.
In California First Amendment Coalition, we were careful to explain that this right of public access is a right belonging to the public, and not a right belonging to any individual. See id. at 873 (“It is well-settled that the First Amendment guarantees the 'public ... a qualified right of access to governmental proceedings.” (emphasis added)). Very recently, the Eleventh Circuit recognized this important distinction in a case where the plaintiff sought governmental information regarding lethal injection, as in the case before us today. Wellons, 754 F.3d at 1265-67, 2014 WL 2748316, at *5-6 (affirming the district court’s denial of a preliminary injunction in part because public access cases “turn on the public’s, rather than the individual’s, need to be informed so as to foster debate”). At oral argument and in his briefing, Wood makes clear that he is asserting a right of access enjoyed by the public at large, and not a right or privilege personal to him. Whatever the scope of the First Amendment right of access, Wood has no greater claim than any other member of the public.
IV
Wood seeks the following information: the source(s), manufacturer(s), National Drug Codes, and lot numbers of the drugs that ADC intends to use in his execution; information regarding the medical, professional, and controlled-substances qualifications of the personnel that ADC intends to use in his execution; and information and documents detailing the manner in which ADC developed its two-drug protocol. It is important to note that the State has already disclosed significant information, including the type of drugs, the dosages to be used, and their expiration dates, as well as the fact that the drugs are domestically obtained and FDA approved; the necessary qualifications for ADC personnel and the fact that the Inspector General verified the qualifications of ADC personnel both before and after the issuance of Wood’s warrant of execution; and the actual two-drug protocol itself.
The fundamental flaw in Wood’s request for a preliminary injunction is that Wood does not actually assert a right of access to a governmental proceeding. The Supreme Court has long held that the First Amendment does not provide a general right to information in the government’s possession. See Houchins, 438 U.S. at 15, 98 S.Ct. 2588; L.A. Police Dep’t v. United Reporting Publ’g Corp., 528 U.S. 32, 40, 120 S.Ct. 483, 145 L.Ed.2d 451 (1999) (“[WJhat we have before us is nothing more than a governmental denial of access to information in its possession. California could decide not to give out arrestee information at all without violating the First Amendment.”); McBurney, 133 S.Ct. at 1718. And the Court has cautioned that “[t]he Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act.” Houchins, 438 U.S. at 14, 98 S.Ct. 2588. This default principle — that there is no general First Amendment right to information in the government’s possession — ought to guide our analysis.
The qualified First Amendment right of access to governmental proceedings is properly viewed as a exception to the default principle, limited to governmental “proceedings and documents filed therein.” CBS, Inc., 765 F.2d at 825. This right does not extend to every piece of information that conceivably relates to a governmental proceeding, even if the governmental proceeding is itself open to the public. It is not a tool for judges to pry open the doors of state and federal agencies because they believe that public access to this type of information would be a good idea. It is a qualified right to certain “proceedings and documents filed therein” and nothing *1093 more. In effect, the right prevents the government from restraining access to proceedings and filed documents that have historically been made available to the public. It is a First Amendment obligation by estoppel, not an untethered license to governmental information.
Wood contends that our precedent guarantees access to the information that he seeks. It does nothing of the kind. Unlike the plaintiffs in California First Amendment Coalition, Wood does not seek access to a criminal proceeding, nor does he seek documents filed in a proceeding or transcripts of the proceeding. Instead, he wants information in the government’s possession; effectively, he has taken the general right of the public to view executions and turned it into a FOIA request for documents related to the execution. California First Amendment Coalition says nothing about information in the government’s possession.
Wood points to our opinion in Courthouse News Service v. Planet, 750 F.3d 776 (9th Cir.2014), as support for the notion that there is a right of access to all records associated with public governmental proceedings. Although we observed that “[t]he federal courts of appeals have widely agreed that [the right of access] extends to civil proceedings and associated records and documents,” we also acknowledged that only public records associated with a governmental proceeding — not all records and information associated with a proceeding — are subject to Press-Enterprise II. Id. at 786 (“[T]he right of access to public records and proceedings is necessary to the enjoyment of the right to free speech.” (emphasis added)). Courthouse News Service thus cannot support Wood’s position.
Wood does not cite a single case in which an appellate court has found a right of access to the type of information at issue in this appeal. No other case has granted a First Amendment right to lot numbers. No other case has granted a First Amendment right to documents relied upon by a state agency in the development of an official policy.[4] In so doing, the majority dramatically expands the scope of the right of access in a way that causes what used to be a limited exception to swallow the default rule, which is that “the First Amendment ... [does not] mandate[] a right of access to government information or sources of information within the government’s control.” Houchins, 438 U.S. at 15, 98 S.Ct. 2588. How far does this newly expanded right reach? It is undisputed that the right of access extends to criminal trials. Richmond Newspapers, Inc., 448 U.S. at 580, 100 S.Ct. 2814. Does it now extend to all documents in the prosecutor’s possession? Jury pool records? See Jury Serv. Res. Ctr. v. De Muniz, 340 Or. 423, 134 P.3d 948 (2006) (rejecting such a claim).[5] Jurors’ address *1094 es? See Commonwealth v. Long, 592 Pa. 42, 922 A.2d 892 (2007) (same). Of course not, but that is the implication of the majority’s holding.[6]
And the principle doesn’t improve by trying to confine today’s rule to executions. Our decision in California First Amendment Coalition was an application of the Supreme Court’s right of access to public proceedings. Today’s ruling strikes out on its own. Either the majority’s ruling has much broader implications, or it is Justice Roberts’s famous “restricted railroad ticket, good for this day and train only.” Smith v. Allwright, 321 U.S. 649, 669, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (Roberts, J., dissenting).
V
Wood has not asserted a First Amendment right of access claim. But even assuming that he has, the question becomes whether the right attaches. This analysis is informed by two “complimentary considerations”: (1) “whether the place and process have historically been open to the press and general public” and (2) “whether public access plays a significant positive role in the functioning of the particular process in question.” Press-Enterprise II, 478 U.S. at 8-9, 106 S.Ct. 2735.
A. Historically Open to the Press and General Public
Wood seeks access to three broad categories of information: (1) manufacturer information, (2) information about the qualifications of ADC personnel, and (3) information about the manner in which ADC developed its two-drug protocol. Wood argues that the information that he seeks is analogous to information disclosed about different methods of execution in the past. For example, some old newspaper accounts include detailed information about ropes used for hangings and the tradesmen and companies that supplied them. Apparently, there was only one company west of the Mississippi that made lethal gas, and a newspaper once published an article on the manufacturer of the gas chambers. Wood points out that even today, the Pinal County Historical Museum displays twenty-eight nooses used for executions in Arizona.[7]
There are a number of reasons why Wood’s historical evidence, relied upon by the majority, see Maj. Op. at 1083-84, is insufficient. First, he has not shown a “historical tradition of public access” to the means of execution beyond what witnesses to the execution could see. Cal. First Amendment Coal., 299 F.3d at 875 (emphasis added). Wood’s historical evidence is best characterized as sporadic and anecdotal. The fact that Godfrey Boger’s obituary revealed that he made ropes for hangings tells us very little.[8] As does the *1095 fact that the Pinal County Historical Museum displays nooses today. Episodic and, at times, non-contemporaneous instances of public disclosure cannot establish a historical tradition of public access. If, in this area, we are not guided by the historical record, we have no guidance but our own sense of what we would like disclosed by the government.
Second, neither the majority nor Wood has shown that the government historically provided open access to the identities of a particular manufacturer. Indeed, several of his examples reveal that it was the manufacturers themselves who chose to publicize their identities. But the relevant consideration is whether the government has historically made the particular proceeding open to the public. See Cal. First Amendment Coal, 299 F.3d at 875 (‘When executions were moved out of the public fora and into prisons, the states implemented procedures that ensured executions would remain open to some public scrutiny.” (emphasis added)). Press-Enterprise I stands for the proposition that if the government has traditionally made a certain proceeding public, it must continue to do so. By construing the right of public access more broadly than any court to date, the majority creates a perverse incentive for the government not to open “proceedings and documents filed therein” to the public in the first place so as not to bind itself going forward. Today’s decision thus undermines the very purpose of the right of public access. If the government is further estopped from restricting access when private actors choose to make proceedings or records public, the government has an additional incentive to take steps to keep private actors from disclosing information regarding governmental proceedings and records. And what happens when the government’s efforts fall short? Can individuals who are determined to disclose governmental information foist a First Amendment obligation on the government to grant access in the future by disclosing government secrets? Surely not. Edward Snowden’s leaks are not relevant to the question of whether there is a First Amendment right of access to FISA court proceedings.
Third, although Wood claims that Arizona previously disclosed drug manufacturer information, Wood has not shown that the State voluntarily disclosed the specific type of manufacturer information that he seeks. Arizona has disclosed this information only pursuant to discovery or under court order. See Schad v. Brewer, No. CV-13-2001-PHX-ROS, 2013 WL 5551668 (D.Ariz. Oct. 7, 2013). Moreover, even if the State had at one time voluntarily disclosed such information, it does not a tradition make: The history of executions by lethal injection is relatively short, as the states have made adjustments to their protocols in response to developments, both public and scientific. Such disclosures do not demonstrate that the information Wood seeks has been historically available to the public.
Fourth, Wood has adduced no historical evidence — none—to support a right of access to two of the three types of information that he seeks: (1) information about qualifications of execution personnel, and (2) information about the manner in which ADC developed its two-drug protocol. As to the former, there is substantial evidence that information about personnel has not been historically available to the public. See Ellyde Roko, Note, Executioner Identities: Toward Recognizing a Right to Know Who is Hiding Beneath the Hood, 75 Fordham L.Rev. 2791, 2829 (2007) (acknowledging that “[hjistorically, executioners have hidden behind a hood — both literally and figuratively.”). And, as to the latter, information about the process by which a state entity developed a policy or *1096 program is the proper subject of statutory disclosure laws.
Wood has thus failed to establish a historical tradition of access to any of the information that he seeks. Although the lack of historical evidence may not foreclose a right of access, Seattle Times, Co., 845 F.2d at 1516, this failing leaves Wood with a tough row to hoe. He would have to show that Press-Enterprise II’s second consideration “weighs heavily in favor” of his asserted right in order to overcome his failing on the first consideration. Id. And, as explained below, he cannot do so.
B. Access Plays a Significant Positive Role
The second factor in determining whether there is First Amendment right of public access is “whether public access plays a significant positive role in the functioning of the particular process in question.” Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. 2735.
1. Manufacturer’s identity
Publicly disclosing the identity of the manufacturer of the drugs to be used in Wood’s execution would not “play[ ] a significant positive role in the functioning” of Arizona’s execution protocol. Id. In California First Amendment Coalition, we reasoned that “[a]n informed public debate is critical in determining whether execution by lethal injection comports with ‘the evolving standards of decency which mark the progress of a maturing society.’ ” 299 F.3d at 876 (quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)). Here, the State has already disclosed the type of drugs that will be used in Wood’s execution, the dosages of those drugs, their expiration dates, the fact that they are FDA approved, and the fact that they were produced domestically. The question before us is whether releasing the name of the manufacturer — or related information such as the National Drug Codes and lot numbers — would have a significant marginal benefit on the public discourse concerning Wood’s execution beyond the benefit that obtains from releasing the information already provided by the State. See Seattle Times, 845 F.2d at 1516 (“The [Supreme] Court has examined whether public access plays a particularly significant positive role in the actual functioning of the proceeding.” (emphasis added)).
The information already released by the State enables informed debate about the lawfulness and propriety of Arizona’s two-drug cocktail. The public knows precisely how the State intends to end Wood’s life and can investigate whether the drugs are suited to that purpose. Wood correctly points out that it is “of particular significance to the public to know that the State that is carrying out its execution process is doing so through unlawful means.” But he does not — and cannot — explain why knowing the drugs’ manufacturer would contribute to discussing whether Arizona’s method is lawful. The identity of the chemicals and their quantities permits a full examination of the issue. Not every conceivable piece of information is equally relevant to the important, ongoing public conversation about the lawfulness of a particular lethal-injection protocol.
The only marginal benefit of disclosing the identity of the manufacturer of the drugs is that it enables the public to discuss the manufacturer’s decision to supply Arizona with the chemicals used in an execution. There is certainly value in such knowledge. For example, consumers who are opposed to capital punishment might wish to avoid doing business with the manufacturers. But the fact that there are some discursive benefits to disclosing the identities of the manufacturers is hardly dispositive. We must also consider the costs of disclosing the information. As the *1097 Supreme Court aptly put it, “[although many governmental processes operate best under public scrutiny, it takes little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly.” Press-Enterprise II, 478 U.S. at 8-9, 106 S.Ct. 2735. The disclosure of information previously kept private by the government often enhances the scope or accuracy of public discourse in some way. But the disclosure of certain kinds of information also hobbles the state’s ability to carry out its legitimate functions. When disclosure inhibits the effectiveness of the process at issue without producing substantial benefits, then public access to the information does not “play[ ] a significant positive role in the functioning of the particular process in question.” Id. at 8, 106 S.Ct. 2735.
Several courts have observed that disclosing the manufacturer of drugs used in executions inhibits the functioning of the process in ways that harm the state, its citizens, and the inmate himself. As the Georgia Supreme Court recently explained, “without the confidentiality offered to execution participants ... there is a significant risk that persons and entities necessary to the execution would become unwilling to participate.” Hill, 758 S.E.2d at 806. In a dissent from denial of rehearing en banc joined by seven other members of our court, Chief Judge Kozinski observed that “Arizona has a legitimate interest in avoiding a public attack on its private drug manufacturing sources.” Landrigan v. Brewer, 625 F.3d 1132, 1143 (9th Cir.2010) (Kozinski, C.J, dissenting from denial of rehearing en banc). In Chief Judge Kozinski’s view, Arizona had “good reasons” to keep the identity of the manufacturer private because a journalist suggested that the company might be criminally liable under a European Union regulation. Id.
Arizona’s ability to enforce its execution protocol will be hindered if it cannot reliably obtain the drugs needed to perform executions. Disclosure of the information that is supposed to “play[] a significant positive role in the functioning of the particular process in question” might instead destroy the process altogether. Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. 2735 (emphasis added). Inmates may suffer if the State is forced to turn to less reliable execution methods that might inflict unnecessary pain. In a recent case, Texas disclosed the name of the compounding pharmacy that produced the chemicals to be used in an execution. Whitaker v. Livingston, No. H-13-2901, 2013 U.S. Dist. LEXIS 144367, at *7 (S.D.Tex. Oct. 7, 2013). The inmate “notified the court that the compounding pharmacy was demanding that Texas return the drugs because it was being harassed.” Id. The inmate was not pleased about the prospect of additional public discourse concerning the drugs that would be used to end his life. Instead, he was understandably “worrie[d] that Texas may have to use a different drug to execute him.” Id. State legislatures have responded to the possibility that no manufacturer will provide the drugs used in lethal injections. For example, Tennessee recently reauthorized the use of the electric chair as an alternative method of execution in the event that the drugs necessary to perform a lethal injection become unavailable.[9]
Arizona had these developments in mind when it changed its protocol. A press release from the Arizona Attorney General explains that “compounding pharmacies in Texas and Oklahoma that had been provid *1098 ing pentobarbital for executions- are now refusing to provide it after their identity was released publicly and they began to receive threats. This kind of reaction has caused companies that sell the drug to corrections’ agencies to stop supplying it for the purposes of inmate executions.” [10] For this reason, the press release describes the need for confidentiality as a “public safety issue.” In the end, efforts to disclose the manufacturers’ identities only renders the imposition of capital punishment more cruel than necessary by making it more difficult for states to reliably and safely execute inmates who were long-ago sentenced to death. Individuals like Wood, who have been lawfully tried and sentenced, are used as a means to accomplish a long-term policy objective that ought to be conveyed to state legislatures rather than federal courts.[11]
Finally, Wood contends that there is no record evidence in this case that disclosing the identity of the manufacturer will “extend the pressure on qualified suppliers not to supply the drugs.” The majority likewise asserts that “the State can point to no evidence in the record to support its claim that pharmaceutical companies will stop providing drugs the moment this information is released.” Maj. Op. at 1086. But, in addition to the aforementioned case law, Wood’s own brief cites multiple news reports detailing how companies have stopped supplying states with drugs used in executions after their identities have been disclosed. Such evidence is crucial to Wood’s argument because -it is the only indication that disclosure of the manufacturer’s identity would “play[ ] a significant positive role in the functioning” of Arizona’s execution process. Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. 2735. The majority also cites news reports as evidence that there has been a “seismic shift in the lethal injection world” as manufacturers have stopped providing thiopental and pentobarbital. Maj. Op. at 1084-85. The majority considers the evidence that drug manufacturers are susceptible to public pressure for the proposition that disclosure creates a dialogue about capital punishment, but ignores the same evidence to the extent that it shows that disclosure potentially hinders the State’s ability to lawfully carry out its lethal-injection protocol by making the requisite drugs harder to obtain.
We do not know with certainty how the public or the drug manufacturer will react if Arizona discloses the manufacturer’s identity. But we do know, from the case law and the arguments advanced by Wood himself, that disclosure might impact Arizona’s ability to perform a lawful execution using domestically produced, FDA-approved drugs. When we compare the risk to Arizona’s execution protocol to the al *1099 leged benefits of additional public discourse about the subject, it is clear that Wood cannot show that “public access plays a significant positive role in the functioning of the particular process in question.” Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. 2735 (emphasis added).
2. Executioners’ qualifications
For much the same reason, publicly disclosing additional information about the qualifications of the individuals who will participate in Wood’s execution would not “play[] a significant positive role in the functioning” of Arizona’s execution protocol. Id. Wood contends that “information about the qualifications of the persons who will execute him — in the name of Arizona’s citizens — is a matter that is squarely within the sphere of ‘informed public debate.’ ” Even if that is true, it is not the issue before us. Once again, the State has already disclosed ample information about the qualifications of those who will participate in the execution. The State informed Wood that the Inspector General had verified the qualifications of the personnel and that a central femoral line would only be inserted by a person licensed or certified to perform the procedure. The question is thus whether disclosing the specific qualifications of the actual individuals chosen by the State to conduct the execution would have a significant marginal benefit on the public discourse concerning Wood’s execution beyond the benefit that obtains from releasing the information already provided by the State.
As with the drug manufacturer’s identity, the information offered by the State related to the executioners’ qualifications enables informed debate about the lawfulness and propriety of Arizona’s execution protocol. The public knows what qualifications are required of medical personnel who participate in the execution and how those qualifications are verified. Wood does not — and cannot — explain how the public’s knowledge of, say, the medical school or nursing school attended by each person participating in the execution, would “play[ ] a significant positive role in the functioning of the particular process in question.” Id. Such information is, at best, irrelevant.
The only way such information could meaningfully contribute to public discourse is if specific information about the qualifications of the personnel allowed for members of the public to identify them. The names of the individuals who take part in the execution, like the names of the companies that manufacture the drugs used in the execution, would certainly contribute to public debate. Members of the public could, for example, protest outside their homes or offices. Reporters could call and ask them about why they decided to participate in an execution. The problem, of course, is that this kind of public discourse would not “play[] a significant positive role in the functioning of the particular process in question.” Id. (emphasis added). Rather, it would severely inhibit Arizona’s ability to conduct lawful executions by making it difficult to find qualified personnel willing to risk their privacy and their careers to participate in an execution. See Hill, 758 S.E.2d at 805 (“The reasons for offering such privacy are obvious, including avoiding the risk of harassment or some other form of retaliation from persons related to the prisoners or from others in the community who might disapprove of the execution as well as simply offering those willing to participate whatever comfort or peace of mind that anonymity might offer.”). Arizona’s confidentiality statute responds to these precise concerns. Ariz.Rev.Stat. § 13-757(C) (“The identity of executioners and other persons who participate or perform ancillary functions in an execution and any information contained in the records that *1100 would, identify those persons is confidential.”).
Wood correctly points out that we cannot know whether disclosing the qualifications of the individuals participating in the execution will lead to the discovery of their names and other personal information. But the mere possibility that this might occur would dissuade qualified individuals from performing a lawful task on behalf of the State and its citizens. Cf. Long, 922 A.2d at 904-05 (Pa.2007) (holding that the First Amendment right of public access does not extend to jurors’ addresses in part because the disclosure of such information “may make the average citizen less willing to serve on a jury, especially if he or she believes that the media, the defendant, or the defendant’s family and friends know where he or she lives”). As with the ongoing efforts to deter drug companies from producing the compounds that most quickly and painlessly cause death, attempts to dissuade qualified medical personnel from participating in lawful executions will likely only harm inmates sentenced to die by forcing states to rely on less experienced professionals.
Disclosing more specific details about the qualifications of the individuals who participate in the execution process risks interfering with the legitimate operation of Arizona’s execution protocol without meaningfully contributing to the public discourse surrounding Wood’s execution.
3. Development of protocol
Lastly, Wood has not shown that disclosing information about how ADC developed its execution protocol will have any effect whatsoever on public dialogue about the subject. The thirty-two page protocol sets out in precise detail how an execution will proceed. The two-drug portion of the protocol includes the type and quantity of drugs that will be used along with a nine-step process for administering the drugs. Anyone who reads the protocol will know exactly how Arizona plans to carry out an execution. Wood does not suggest what might be gleaned from reviewing information generated during the protocol’s development, let alone how access to such information will “play[] a significant positive role in the functioning” of an execution. Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. 2735 (emphasis added).
In sum, Wood has not shown a historical tradition of public access to the information that he seeks, and he cannot show that such access would play a significant positive role in the functioning of the State’s administration of lethal injection. Accordingly, he has no First Amendment right to access the information and he cannot show a likelihood of success on the merits.
VI
The parties and the district court understandably focused primarily on the likelihood that Wood’s First Amendment claim will succeed on the merits. But we must also consider the other factors that comprise the preliminary injunction analysis, in particular the likelihood of irreparable harm in the absence of preliminary relief. See Winter, 555 U.S. at 20, 129 S.Ct. 365.
No one doubts that Wood “has a strong interest in being executed in a constitutional manner.” Beaty v. Brewer, 649 F.3d 1071, 1072 (9th Cir.2011). But the right asserted by Wood differs from the constitutional challenges often raised by inmates facing execution. The First Amendment right of public access inheres in all of the members of the public, and not just the inmate who has been sentenced to death. See Cal. First Amendment Coal., 299 F.3d at 873 (“[T]he First Amendment guarantees the public — and the press — a qualified right of access to governmental proceedings.” (emphasis added)). The fact *1101 that Wood will soon be executed absent judicial intervention does not necessarily mean that there will likely be “irreparable harm in the absence of preliminary relief.” Winter, 555 U.S. at 20, 129 S.Ct. 365. Wood’s claim is premised on the notion that society will have a richer discourse about his execution if everyone is made aware of certain details, such as the manufacturer of the drugs used and the qualifications of the executioners employed. It is not self-evident that the First Amendment right will be irreparably harmed if that information is not disclosed before Wood’s execution, but is instead disclosed only if the view espoused by Wood ultimately prevails after the case is fully litigated. Whatever benefit society derives from being able to discuss who made the drug and who injected it would presumably still inure to the public if that conversation occurred after Wood has been executed.
Despite the impression offered by the substance of the briefs and opinions in this case, this litigation is not really about the scope of the First Amendment right of the public to access certain information pertaining to an execution. The existence and scope of that right could be fully litigated by a member of the public who feels he has been unconstitutionally deprived of the information at issue. See Wellons, 754 F.3d at 1266-67, 2014 WL 2748316, at *6 (holding that the purported First Amendment right of public access to information about the manufacturer of drugs used in an execution and the identities of the executioners “turn[s] on the public’s, rather than the individual’s, need to be informed so as to foster debate”).
And, despite the impression offered by the majority’s disposition, this litigation is not even about staying Wood’s execution. Arizona now faces a difficult choice. The State can continue to enforce its confidentiality statute and refrain from executing Wood or anyone else until it prevails on the merits, as seems quite likely. Or, the State can disclose the information required by the majority and execute Wood, knowing that it might be impossible to obtain the drugs necessary to carry out future lawful executions once the identity of the manufacturer is no longer confidential. Either way, the First Amendment has been co-opted as the latest tool in this court’s ongoing effort to bar the State from lawfully imposing the death penalty.
VII
The decision to inflict the death penalty is a grave and solemn one that deserves the most careful consideration of the public, the elected branches of government, and the courts. We must be cognizant that a life is at stake. But we cannot conflate the invocation of a constitutional right belonging to the public at-large— such as the First Amendment right of public access to certain proceedings and documents — with a policy judgment about if and when the death penalty ought to be imposed. In so doing, we usurp the authority of the Arizona legislature and disregard the instructions of the Supreme Court.
The district court did not abuse its discretion when it denied Wood’s request for a preliminary injunction. I would affirm the district court’s judgment.
I respectfully dissent.
ORDER
The full court has been advised of the petition for rehearing en banc. Pursuant to the rules applicable to capital cases in which an execution date has been scheduled, a deadline was established by which any judge could request a vote on whether the panel’s July 19, 2014 opinion should be reheard en banc. A judge requested a *1102 vote on whether to rehear the panel’s opinion en banc. A majority of the non-re-cused active judges did not vote in favor of rehearing en banc. Judges Graber, Murg-uia, and Hurwitz did not participate in the deliberations or vote in this case. The petition for rehearing en banc is denied. The Court’s July 19, 2014 opinion, granting a conditional stay of Wood’s execution, remains in effect.

. The current execution protocol, found in Department Order 710, calls for the use of 50 *1089 mg of midazolam and 50 mg of hydromor-phone. It also provides for one-drug protocols using pentobarbital or sodium pentothal.

. See Press Release, Attorney Gen. of Ariz., State of Arizona Announces Change to Lethal Injection Protocol (March 26, 2014), https:// www.azag.gov/press-release/state-arizona-announces-change-lethalinjection-protocol.

. A warrant of execution was issued on May 28, 2014.

. Not only is the majority’s position unsupported by a decision from any appellate court, it creates a circuit split with an opinion issued by the Eleventh Circuit just last month, Wellons, 754 F.3d at 1266-67, 2014 WL 2748316, at *6, and it is flatly inconsistent with an opinion issued by the Georgia Supreme Court two months ago, Hill, 758 S.E.2d at 805-06.

. Recognizing the distinction between "proceedings and documents filed therein” and information in the government’s possession, the Oregon Supreme Court wrote:
[T]he Court of Appeals mistook access to a public trial for access to government information. The United States Supreme Court’s emphasis in the Press-Enterprise cases was on access of the public to the trial itself, not on the process that lead to the selection of the actors in that event. Those cases establish that the public has a right to attend criminal trials. The selection of names for the list of prospective jurors, however, is one or more (sometimes several) steps removed from the trial itself.... Unlike actual trials, public access plays no significant role in the official and largely *1094 rote function of collecting and winnowing names for jury lists.... So understood, the dispute is far more analogous to cases in which the United States Supreme Court has ruled that the general public does not have a First Amendment right of access to places, information, and documents within the government's control than it is to the Press-Enterprise cases.
Jury Serv. Res. Ctr., 134 P.3d at 954.

. The majority purports to limit its holding to information "inextricably intertwined” with execution. Maj. Op. at 1082-83. That’s a responsible sounding phrase. Unfortunately, the veneer of responsibility is only skin deep. If lot numbers and National Drug Codes are "inextricably intertwined,” then documents in the prosecution’s possession and jury pool records — which are far more relevant to a core public proceeding — are certainly "inextricably intertwined” as well.

. See Pinal County Historical Soc. & Museum, Our Exhibits, www.pinalcountyhistorical museum.org/exhibits.htm (last visited July 19, 2014).

. See Made Hangman's Ropes, The Gazette Times, July 16, 1911, at 13.

. See Tim Ghianni, Tennessee Reinstates Electric Chair as Death Penalty Option, May 23, 2014, available at http://www.reuters.com/ article/2014/05/23/us-usa-tennessee-execution-idUSBREA4M03520140523.

. See Press Release, Attorney Gen. of Ariz., State of Arizona Announces Change to Lethal Injection Protocol (March 26, 2014), https:// www.azag.gov/press-release/state-arizona-announces-changelethal-injection-protocol.

. The majority thinks that exposing the names of the manufacturers of drugs used in lethal injections is especially important in light of the "seismic shift in the lethal injection world in the last five years” and the "flawed executions this year” involving the drugs at issue here. Maj. Op. at 1084-85. But the "seismic shift” and "flawed executions” have been caused in part by past disclosures of the manufacturers of the drugs used in lethal injections that have made the drugs difficult or impossible to obtain. As the majority points out, "[s]tates are now seeking new types and combinations of drugs” because thiopental and pentobarbital are no longer readily available. Maj. Op. at 1085. The majority identifies a policy development it deems undesirable — the need to use different and possibly less effective drugs to carry out lethal injections — and then interprets the First Amendment in a novel manner in order to exacerbate rather than ameliorate the problem.